308 F.2d 875
 Charles A. MEEKER and his wife, Sybil Meeker, Appellants,
v.
AMBASSADOR OIL CO., Inc., Appellee.
W. G. HAUN, Appellant,
v.
Charles A. MEEKER, Sybil Meeker, Domestic Oil Corporation, a corp., American Drilling Company, Inc., a corp., Richard H. Meeker, Louis T. Heath, Norman Gluss, Glenn A. Smalley, Michael O'Rourke, Elfrida Von Nardroff, Edward E. Brook, Harry E. Collins, T. M. Mulherin, Olive Mulherin, Joseph P. Mulherin, Walton Dismukes, H. K. Kugel, Tom Kugel, Mary Jane Kugel, C. T. Fitzgerald, H. O. Hollingsworth, E. M. Zacharias, Clara M. Zacharias, E. Roughton, Pat Roughton, Frans Schwable, Beverly Schwable, Jack R. Lloyd, James B. Bell, B. D. Ratcliff, C. W. Andrews, The Coates-Southwest Title Company, now the Southwest Title and Trust Co., a corp., and Champlin Oil and Refining Company, a corp., Appellees.
 No. 6822.
 No. 6823.
 United States Court of Appeals Tenth Circuit.
 September 10, 1962.
 
 COPYRIGHT MATERIAL OMITTED O. R. Adams, Jr., Albuquerque, N. M., for Charles A. Meeker.
 Laverne Morin, Wichita, Kan. (T. Murray Robinson, Wallace E. Robertson, C. E. Barnes, J. M. O'Loughlin, J. Thornton Wright, Jr., and J. Stanley Gill, Oklahoma City, Okl., George B. Collins, Oliver H. Hughes, Robert Martin, Kenneth W. Pringle, Jr., William F. Schell, Thomas M. Burns and Robert M. Collins, Wichita, Kan., with him on the brief), for W. G. Haun.
 C. Harold Thweatt, Oklahoma City, Okl. (Crowe, Boxley, Dunlevy, Swinford & Johnson, Oklahoma City, Okl., with him on the brief), for Ambassador Oil Corp.
 Before MURRAH, Chief Judge, and PHILLIPS and SETH, Circuit Judges.
 PHILLIPS, Circuit Judge.
 
 
 1
 These are appeals from a single judgment in two cases consolidated for trial in the court below and for the hearing of the appeals in this court.
 
 
 2
 In No. 6822, Charles A. Meeker and his wife, Sybil Meeker, brought an action against Ambassador Oil Corporation, Hettie E. Lowder, Merle Smith and W. G. Haun. In their second amended complaint they set up two claims. The first claim sought an adjudication that plaintiffs were the owners of an undivided overriding royalty interest of 1/16 of 7/8 in the oil and gas produced under an oil and gas lease, dated June 3, 1958, running from Lowder to Herman L. Hurst for a primary term of 30 days, covering the East ½ of the Northwest ¼ and the West ½ of the Northeast ¼ of Section 23, Township 16 North, Range 4 West, Logan County, Oklahoma, containing 160 acres (hereinafter called the 30-day lease); that none of the defendants in such action have any interest in the oil and gas produced or to be produced from such land, except the 1/8 royalty interest reserved by Lowder under such lease; and that Ambassador account for the Meekers' share of any moneys received by it from production from such land. In their second claim they sought damages against Smith, Lowder and the Ambassador Oil Company for alleged slander of their asserted title to such overriding royalty interest.
 
 
 3
 In No. 6823, Haun brought an action against the Meekers, Domestic Oil Corporation, American Drilling Company, Inc., Edward E. Brook and others, seeking a judgment decreeing him to be entitled to an overriding royalty interest in 1/16 of 7/8 of the oil, gas and other minerals produced from the 160-acre tract and for an accounting for his share of the oil and gas produced from such land by the defendants.
 
 
 4
 Before undertaking to state the conflicting claims asserted by the parties in such actions, we shall undertake to state the basic facts, which are not in dispute.
 
 
 5
 Lowder, at all times herein material, was the owner of the above described 160-acre tract. On June 3, 1953, she executed and delivered an oil and gas lease, running to H. S. Smith, for a primary term of 5 years, covering such 160 acres, hereinafter called the 5-year lease. It was duly recorded on July 9, 1954. It remained in effect during the primary term by the payment of delay rentals. On December 30, 1955, Smith assigned it to Haun. On December 30, 1957, Haun assigned it to Hurst, reserving an overriding royalty of "1/16 of 7/8ths of all oil, gas and casinghead gas produced, saved and marketed from" such 160 acres "under the provisions of" such "lease, or any extension or renewal thereof." The assignment provided that such overriding royalty should be free and clear of any cost and expense of development and operation, "excepting taxes applicable to said interest and the production therefrom."
 
 
 6
 At the time of the assignment of the 5-year lease to Hurst, he also obtained a farmout from the Continental Oil Company of an adjoining 160-acre lease, called the Robinson lease, and purchased two adjacent leases known as the Austin and Telford leases, to form a development block of 640 acres.
 
 
 7
 The Meekers and their associates drilled a well on the Robinson lease. It was commenced May 8, 1958, and completed July 9, 1958, as a producing well.
 
 
 8
 On April 30, 1958, Lowder executed and delivered to Hurst the 30-day lease, in which she reserved a 1/8 royalty. It was duly recorded June 12, 1958. The lease provided it should remain in force for a term of 30 days from June 3, 1958, and for so long thereafter "as oil or gas or either of them is produced from said land by lessee," and if no well was commenced on the land before July 3, 1958, the lease would terminate.
 
 
 9
 By an assignment dated May 15, 1958, and duly recorded June 12, 1958, Hurst transferred to the Meekers an overriding royalty interest of 1/32 of 7/8 and 33/128 of the working interest in the 30-day lease. By the same instrument Hurst transferred to 16 other named assignees, apparently nominees of the Meekers, 31/128 of the working interest in the 30-day lease. By an assignment dated October 2, 1958, and duly recorded October 3, 1958, Hurst transferred to the Meekers an overriding royalty interest of 1/32 of 7/8 in the 30-day lease. By an assignment dated June 3, 1958, and duly recorded June 26, 1958, Hurst conveyed to Haun a 1/16 of 7/8 overriding royalty interest in the 30-day lease.
 
 
 10
 Edward E. Brook was the President of the Domestic Oil Corporation and American Drilling Company, Inc. He was the sole stockholder in American and owned about 75 per cent of the stock in Domestic. It was stipulated at the pretrial conference that after Hurst acquired the 30-day lease, the Meekers and Brook agreed that each would own ½ of 15/16 of the 7/8 working interest in such lease and that thereafter Hurst conveyed to Edward E. Brook and the American Drilling Co., Inc., ½ of 15/16 of the 7/8 working interest and conveyed to the Meekers ½ of 15/16 of the 7/8 working interest. After the two last-mentioned transfers from Hurst were made, the Meekers, Brook and the American Drilling Company transferred to other parties fractional parts in their working interest in the 30-day lease. It was further stipulated at the pretrial conference held on September 7, 1960, that the Meekers then owned 27/128 × 15/16 of the 7/8 working interest in the 30-day lease and 27/128 × 29/32 of the 7/8 working interest in an oil and gas lease dated July 22, 1958, duly recorded August 14, 1958, running from Lowder to Ambassador, covering the 160-acre tract, and hereinafter called the Ambassador lease; that American then owned 3/16 × 15/16 of the 7/8 working interest in the 30-day lease and 93/512 × 29/32 of the 7/8 working interest in the Ambassador lease, and that Brook then owned 3/16 × 15/16 of the 7/8 working interest in the 30-day lease and 97/512 × 29/32 of the 7/8 working interest in the Ambassador lease. The remainder of the working interest was then owned by other persons by virtue of assignments from the Meekers, or American, or Brook.
 
 
 11
 On March 28, 1958, a contract was entered into between Hurst, Brook, as President of American, and the Meekers for the development of the land covered by the 30-day lease. A title opinion was furnished by Hurst to Meeker and Brook, which disclosed the overriding royalty interest of Haun. It was the intention of the Meekers to develop the property under the 30-day lease thereafter to be acquired by Hurst.
 
 
 12
 On July 1, 1958, Hurst staked out a 10-acre location on the 30-day lease. On the same day, the Beck Construction Company was ordered to do certain work preliminary to drilling on the lease. Beck started work on the afternoon of July 1 and continued on July 2. It built a road, a circulating pit, and leveled the ground for the drilling rig at the 10-acre location. After the work was started on the 10-acre location, Hurst was advised that because the sand was only nine feet thick, a well on the 10-acre location would not be profitable. He then staked out a 20-acre location on the 30-day lease and Beck broke ground on the second location. All of this occurred on July 1 and July 2. On July 2, 1958, Hurst forwarded to the Oklahoma Corporation Commission a written notification of intention to drill on the 10-acre location and another notice of intention to drill on the 20-acre location. While the preliminary work was being carried on and on July 2, Sunray Mid-Continent Oil Company, which owned an oil and gas lease directly offsetting the 30-day lease to the south and east, called Hurst and objected to Hurst proceeding with the drilling of a well at either of such locations and requested him not to drill until a spacing order had been obtained from the Oklahoma Corporation Commission covering the area in which Sunray's lease and the 30-day lease were located.
 
 
 13
 It is fairly inferable from the testimony of Hurst that when Sunray objected on July 2, 1958, to the drilling of a well on the 10-acre and 20-acre locations that it advised Hurst it was going to make an application for the establishment of 40-acre drilling and spacing units. Hurst testified that he and his associates "wanted to go along with Sunray, because they were neighbors and would help develop this field."
 
 
 14
 On July 16, 1958, Sunray filed an application with the Oklahoma Corporation Commission for an order establishing 40-acre drilling and spacing units in the Southwest ¼ of Section 13, the South ½ of Section 14, all of Section 23, the West ½ of Section 24, the Northwest ¼ of Section 25, and the North ½ of Section 26, all in Township 16 North, Range 4 West, Logan County, Oklahoma. The application expressly stated that exceptions should be granted to "all wells drilled or drilling." Meeker and his associates and Sunray owned all of the oil and gas leases on such land. On September 2, 1958, the Oklahoma Corporation Commission entered its order establishing 40-acre drilling and spacing units for the above-described land, except for Robinson No. 1 Well, located on the Northeast ¼ of the Northeast ¼ of the Southwest ¼ of such Section 23 and ordered that such well should be the permitted well for the unit on which it was located.
 
 
 15
 As a further reason for not proceeding with drilling a well on the 30-day lease, Hurst testified that had the Meekers and their associates proceeded with the drilling of the well on the 20-acre location while the Sunray spacing application was pending before the Corporation Commission and had the Corporation Commission thereafter entered a 40-acre spacing order, the Commission would have penalized the well on the 20-acre location by reducing its allowable. Meeker testified that they would have been penalized on their allowable, had they proceeded with the well while Sunray's application was pending.
 
 
 16
 Late in August, 1958, Lowder Well No. 1 was staked at a new location on the Southwest ¼ of the Northeast ¼ of Section 23, Township 16 North, Range 4 West. It was spudded in on September 7, 1958, and on September 9, 1958, it had reached a depth of 2,057 feet. Hurst had represented to Domestic that he had obtained from Lowder an extension of the 30-day lease, until October 1, 1958. Such extension had not been given. On September 9, 1958, a representative of Ambassador notified Brook and Domestic that Ambassador had a lease on the 160-acre tract. Domestic then shut down operations and advised Hurst of Ambassador's claim. Brook and Hurst consulted Mr. C. D. Stinchecum, who was Domestic's attorney, and he advised them he was fearful the 30-day lease had expired for failure to continue the drilling of the well on either the 10-acre or 20-acre location with due diligence. Stinchecum also advised Brook to endeavor to work out an arrangement with Ambassador that would protect the interest of Brook and his associates.
 
 
 17
 On September 10, 1958, Hurst entered into negotiations with Ambassador. On that date an oral agreement was reached between Hurst and Ambassador, by which Ambassador agreed to transfer the Ambassador lease to Domestic, insofar as it covered the 160-acre tract, reserving to Ambassador a 3/32 of 7/8 overriding royalty interest, together with an oil payment of $2,500, payable out of 29/32 of 7/8 of the production. The agreement was consummated by an assignment from Ambassador to Domestic, executed September 15, 1958, and duly recorded September 30, 1958, in Book 390 at Page 592 of the Records of Logan County, Oklahoma.
 
 
 18
 Brook testified that Hurst made the agreement with Ambassador "for the benefit of everybody." We think it quite obvious that by the word "everybody" he meant the working interest owners. The owners of the working interest were tenants in common.[1] Brook owed a duty to his coowners of the working interest to protect their interests.[2] Each of the working interest owners received an assignment of approximately the same proportion of the working interest under the Ambassador lease as he owned in the working interest under the 30-day lease. No assignments of overriding royalty interests were made by Domestic or by owners of the working interest to the Meekers or to Haun.
 
 
 19
 The assignment from Ambassador to Domestic contained the following stipulation:
 
 
 20
 "As an additional consideration for the assignment of the lease hereby assigned, Assignee hereby covenants and agrees:
 
 
 21
 "(a) That the lease hereby assigned is the effective oil and gas lease covering the land hereinabove described, and that the lease of record under which Assignee commenced drilling operations has terminated and is no longer effective; * * *."
 
 
 22
 Immediately after the oral agreement was made, Domestic resumed drilling Lowder Well No. 1 and completed it as a producing oil well on October 4, 1958.
 
 
 23
 On October 8, 1958, Domestic assigned to Charles and Sybil Meeker, as joint tenants, an undivided ½ of the 7/8 working interest in the Ambassador lease, insofar as it covered the 160-acre tract above described. The assignment contained this provision:
 
 
 24
 "This assignment is made subject to the terms and provisions of the agreement dated October 8, 1958, between Assignor and Charles A. Meeker, and is subject to its proportionate part of an outstanding 3/32 overriding royalty interest and a $2,500.00 oil payment. By accepting this assignment assignees do not recognize the validity of the lease above described and expressly reserve the right to contest its validity. This assignment is subject to all of the provisions of the lease assignment from the Ambassador Oil Corporation to Domestic Oil Corporation recorded in Book 390, Page 592, in the office of the County Clerk of Logan County, Oklahoma."
 
 
 25
 When Ambassador notified Domestic that it held a lease from Lowder on the land on which Domestic was drilling Lowder Well No. 1, Brook and Hurst undertook to contact Mr. Meeker at Albuquerque by telephone, ascertained he had gone to California, and were unable to locate him. A day or two after September 10, 1961, the date when the compromise agreement was reached with Ambassador, the Meekers were notified of the terms of such agreement. While Meeker expressed dissatisfaction with such compromise agreement, which was entered into for the benefit of all the working interest owners, he did not notify Brook, Domestic, or Ambassador that he repudiated the agreement, but stood by until the well was completed as a producing well. Thereafter, he accepted the assignment of October 8, 1958, from Domestic, in which he undertook to reserve his right to challenge the validity of Ambassador's lease, with full knowledge of the terms and provisions of the assignment from Ambassador to Domestic and the reservations therein contained. After the well came in, Meeker signed division orders on the basis of the Ambassador lease and the assignments thereof to Ambassador and the Meekers and the other owners of the working interest and received pipeline payments under such division orders.
 
 
 26
 The trial court held that the 30-day lease was an extension of the 5-year lease; that the operations on the 30-day lease on July 1, and 2, 1958, constituted the commencement of drilling of a well on such lease, but that such lease expired prior to the commencement of Lowder Well No. 1, by reason of the lessees' failure to continue drilling operations with reasonable diligence. It also held that the Meekers were estopped to deny Ambassador's rights to the overriding royalty and the oil payment reserved to it in its assignment to Domestic.
 
 
 27
 It held that Haun's rights to his overriding royalty terminated when the 30-day lease expired and that Haun was not entitled by reason of any fiduciary relationship between him and Hurst, Brook, the Meekers and the other owners of the working interest to receive an overriding royalty of 1/16 of 7/8 of the oil and gas produced under the Ambassador lease. Judgment was entered accordingly and the Meekers and Haun have appealed.
 
 * The Claims of the Meekers — No. 6822
 
 28
 The first claim of the Meekers in Number 6822 is in substance an action to quiet title. The only interests in dispute are the Meekers' claim to an overriding royalty interest of 1/16 of 7/8 of the oil and gas produced under the 30-day lease and Ambassador's claim to an overriding royalty interest of 3/32 of 7/8 of the oil and gas produced and to an overriding royalty interest of 29/32 of 7/8 of the oil and gas produced until it has received $2,500 therefrom. The working interest is not in dispute. The Meekers' share of the working interest was substantially the same under the 30-day lease and under the assigned Ambassador lease. The Meekers requested a jury trial of their first and second claims in their second amended complaint. Their request was denied.
 
 
 29
 In Oklahoma the lessee's interest under an oil and gas lease is neither a corporeal nor a possessory interest in the land. While it is a presently vested interest in the land of another, it is an incorporeal interest, or a profit a prendre.[3]
 
 
 30
 An oil and gas lease gives to the lessee an exclusive right — subject to legislative control to prevent waste, to secure the greatest ultimate recovery of oil and gas, and to protect correlative rights — to erect structures on the surface of the land covered by the lease, to explore for oil and gas by drilling wells through the underlying strata, to reduce to possession the oil and gas found and obtained through such wells, and thus acquire absolute title to such oil and gas as personal property.[4]
 
 
 31
 An overriding royalty is a fractional interest in the gross production of oil and gas under a lease, in addition to the usual royalties paid to the lessor, free of any expense for exploration, drilling, development, operating, marketing and other costs incident to the production and sale of oil and gas produced from the lease.[5] It is an interest carved out of the lessee's share of the oil and gas, ordinarily called the working interest, as distinguished from the owner's reserved royalty interest.[6]
 
 
 32
 It is generally held that an overriding royalty is an interest in real property.[7]
 
 
 33
 While ordinarily the overriding royalty reserved in the assignment of the lessee's working interest carves out a share of the lessee's interest in the oil and gas produced free from expense, in the absence of clear language manifesting an intent so to do, it does not create the relation of tenancy in common between the lessee and overriding royalty owner, nor give the latter the right to enter upon and develop the lease and produce oil and gas therefrom.[8]
 
 
 34
 It follows that the owner of an overriding royalty interest does not have a corporeal or possessory interest in land, which could be the subject of an action in ejectment.[9]
 
 
 35
 It is well settled that an action to quiet title is within the jurisdiction of a court of equity and as a general rule there is no right to a jury trial.[10] However, one out of possession may not maintain an action in the Federal courts in an action to quiet title against one in possession if an action in ejectment would afford a plain, adequate and complete remedy at law.[11] But Ambassador is not in possession and it has no possessory right under the overriding royalty reserved in its assignment and neither an action in ejectment nor other legal action against Ambassador would afford a plain, adequate and complete remedy at law to the Meekers.[12]
 
 
 36
 Accordingly, we conclude that the Meekers' first claim in their second amended complaint was a suit in equity and that they were not entitled to a jury trial on such claim.
 
 
 37
 The Meekers assert that the trial court erred in holding that the owners of the working interest under the 30-day lease failed to continue with due diligence the drilling of the well commenced during the primary term of such lease.
 
 
 38
 Due diligence is measured by what a reasonably prudent operator would do under the existing facts and circumstances, having regard for the interest of both the lessor and the lessee.[13]
 
 
 39
 The term of the Lowder 5-year lease expired on June 3, 1958. Prior to that date, none of the owners of the working interest had done anything toward the development for oil and gas of the land covered by the lease. Realizing that the 5-year lease was about to expire, Hurst, in April, 1958, requested Lowder to give him the 30-day lease. Lowder complied with the request and executed the 30-day lease, the primary term of which terminated on July 3, 1958. From the shortness of the primary term and other surrounding facts and circumstances, it is reasonable to infer that Lowder and Hurst contemplated that the owners of the working interest under such lease would promptly and without further delay develop the land for oil and gas, acting with diligence and dispatch.
 
 
 40
 Within the primary term of the 30-day lease, the owners of the working interest did nothing more than stake out two drilling sites, construct roads and dig certain pits. Thereafter, they did nothing further until the latter part of August, 1958. They seek to excuse the delay by the fact that Sunray objected to the drilling of the well on the 30-day lease at either the 10-acre or 20-acre location and because of Sunray's pending application for a spacing order.
 
 
 41
 In its application Sunray expressly stated that exceptions should be granted to all wells drilled or drilling within the area described in the application. The order of the Commission excepted the Robinson well and provided that it should be the permitted well for the unit on which it was located. Had the owners of the working interest continued the drilling of the well on the 20-acre location, commenced by them during the primary term of the lease, while the spacing application was pending, it is a reasonable assumption that such well would have been excepted from the spacing order. Moreover, as an alternative course, when Sunray objected to either the 10-acre or 20-acre location, they could have, within the primary term of the 30-day lease, proceeded with work on a 40-acre location that would have constituted the commencement of the drilling of a well; and when, thereafter, on July 16, 1958, Sunray applied to the Oklahoma Corporation Commission for the order establishing a 40-acre drilling and spacing unit, they could have proceeded safely with the drilling of the well on the 40-acre location. Because the producing sand was only about eight feet thick, it would not have been feasible or economical to drill wells in the area on a spacing unit of less than 40 acres and one well would drain the recoverable oil from the formation underlying 40 acres. The Corporation Commission so found in its spacing order. We are of the opinion there was no reasonable excuse, under the facts and circumstances, for the Meekers and their associates failing to proceed with the drilling of a well, either on a 20-acre or 40-acre location on the 30-day lease, while Sunray's application was pending. The trial court applied the correct test and we cannot say that his finding that, under the existing facts and circumstances, the owners of the working interest in the 30-day lease failed to proceed with due diligence with the drilling of the well, which they commenced within the primary term, was erroneous. Accordingly, we conclude that the trial court correctly held that the 30-day lease expired by reason of the failure of the Meekers and the other owners of the working interest to continue the drilling of an oil and gas well with reasonable diligence after the expiration of the primary term of the lease.
 
 
 42
 The Meekers would have been entitled to a jury trial upon proper and timely request therefor of any issues remaining for determination on their second claim. However, the trial court, in the exercise of its equity jurisdiction, had determined that the 30-day lease had terminated and that the Meekers had no title to any interest under such lease. Since the Meekers had no title that could have been slandered by the acts of the defendants, no issues were left to be tried on the Meekers' second claim.
 
 
 43
 The Meekers, with full knowledge of the facts, stood by and permitted American to continue the drilling of Lowder Well No. 1 under the provisions of the assignment from Ambassador to Domestic. Their working interest under the 30-day lease was in jeopardy, due to the fact that such lease may have terminated by the failure to diligently continue drilling of the well commenced during the primary term of such lease, an event which the trial court later held had happened. Their working interest was safeguarded and the risk of continuing the drilling of Lowder Well No. 1 under a doubtful title was eliminated by the assignment from Ambassador to Domestic, taken for the benefit of the Meekers and other owners of the working interest. Moreover, the Meekers signed division orders on the basis of their interest under the Ambassador lease and received payments in accordance with their working interest under such lease. From the foregoing, it will be seen that the Meekers accepted benefits under the Ambassador lease, with full knowledge of the facts, and we agree with the trial court that they thereby ratified the assignment from Ambassador to Domestic and are bound by the provisions thereof. A party cannot claim benefits under a transaction or instrument and at the same time repudiate its obligations.[14]
 
 II
 
 The Haun Claim — No. 6823
 
 
 44
 The Haun claim is predicated on the contention that a fiduciary relationship existed between Haun, on the one hand, and Hurst, Brook, the Meekers and other owners of the working interest under the 30-day lease, on the other hand; and that by reason thereof the latter were obligated to protect the rights of Haun in any extension or renewal of the 30-day lease and that Haun was entitled to an overriding royalty of 1/16 of the working interest acquired by assignments of the Ambassador lease.
 
 
 45
 Ordinarily, an overriding royalty reserved in an assignment of a lease does not survive the termination of the assigned lease.[15] The mere assignment of an oil and gas lease does not create a fiduciary relationship between the assignor and the assignee.[16] However, such a relationship may arise by virtue of additional provisions in such assignment or in a contemporaneous agreement.[17]
 
 
 46
 We hold there was no fiduciary relationship between Haun and the owners of the working interest when the Ambassador lease was assigned to Domestic or at any time thereafter.
 
 
 47
 We are of the opinion that the cases principally relied upon by counsel for Haun are clearly distinguishable on the facts from the instant case, as we shall now undertake to show.
 
 
 48
 In Probst v. Hughes, 143 Okl. 11, 286 P. 875, 69 A.L.R. 929, the facts were these: An overriding royalty was reserved in an assignment of an oil and gas lease. The assignment provided: "This reservation shall likewise apply as to all modifications, renewals of such lease or extensions that the assignee, his successors or assigns may secure." Thereafter, the assignee developed the lease for gas and gas was produced from the leased premises subsequent to the primary term of the lease, but such production ceased on June 1, 1924. However, on April 23, 1924, and while the lease was still in force and effect, the assignees made an annual payment under the lease for gas produced therefrom. The court held that such payment, notwithstanding the cessation of production, continued the lease in effect until after November 10, 1924. On the latter date, the assignees secured another lease of the land covered by the original lease from the grantees of the original lessor. The court held that a fiduciary relationship existed between the assignors and assignees; that the new lease was, in effect, an extension of the original lease, and that the new lease was charged with the overriding royalty reserved to the assignors in the original lease. In the instant case, a third party, who was a stranger to owners of the working interest in the 30-day lease, obtained the second lease and the assignment to Domestic took place after the 30-day lease had terminated.
 
 
 49
 In Rees v. Briscoe, Okl., 315 P.2d 758, the court held that under the facts a fiduciary relationship existed between the assignor of oil and gas leases, who reserved an overriding royalty, and the assignee thereof, and that such assignor was entitled to an overriding royalty under a second lease secured by the assignee. In that case Rees, the original lessee in oil and gas leases, assigned the leases as to two tracts covered thereby, reserving an overriding royalty. On the same date the assignment was made, the assignee executed an agreement whereby it agreed it would commence drilling operations on one of the two tracts, on or before a specified date and drill to the Bartlesville sand. The assignee did commence such well and it was completed as a producer. Rees's leases covered 70/80 of the minerals in a third tract. While the assignee was engaged in drilling such well, Rees transferred the leases as to such third tract to such assignee. The last assignment reserved an overriding royalty, but did not contain a specific provision obligating the assignee to develop the third tract. However, the assignee orally promised the assignor to develop and drill wells on such third tract before the expiration of the leases. The assignee failed so to do, but while such leases were in force and unexpired, obtained a renewal lease on such third tract. It did not provide for an overriding royalty for the assignor. At the time the assignee was attempting to obtain the renewal of the leases, the owners of the minerals offered a renewal lease to the assignor, who declined it in favor of the assignee. After it obtained the renewal lease, the assignee drilled and obtained production on the third tract.
 
 
 50
 The facts in Rees v. Briscoe are materially different from the facts in the instant case, in that here there was no express agreement, oral or written, obligating Hurst or his successors to drill and develop either the 5-year lease or the 30-day lease; no such agreement may be implied from the assignment of an oil and gas lease, which reserves an overriding royalty;[18] Haun did not have an opportunity to obtain a renewal lease from Lowder and hence did not waive such an opportunity in favor of Hurst and his successors in reliance upon the justified belief that they would protect his overriding royalty interest in any renewal lease; and the assignment to Domestic was made after the 30-day lease had expired.
 
 
 51
 In Oldland v. Gray, 10 Cir., 179 F.2d 408, the facts were these: In 1926, a group referred to in the opinion as the Oldland Group assigned their original prospecting permit on 1,760 acres of public lands, issued under the 1920 Leasing Act, 30 U.S.C.A. § 181 et seq., to one McLaughlin. The assignment provided that in the event leases were issued to the assignee under the permit and production was obtained, McLaughlin would pay to the Oldland Group a stipulated percentage of the market value of the oil and gas produced and saved from the leases. In the assignment McLaughlin expressly agreed "to carry on such drilling and operations on the said permit area as to fulfill the terms and conditions of the said permit within the period herein prescribed or any extensions thereof" and in such assignment it was further agreed that McLaughlin should have the right to terminate the agreement and discontinue operations, provided that on abandonment he would quitclaim all his right, title and interest in the permit to the Oldland Group and, if on the date of the reassignment he had not complied with the drilling requirements of the permit, he would pay them $2,000. In 1938 McLaughlin applied for a lease in exchange for the prospecting permit, as contemplated by the 1935 amendment to the 1920 Leasing Act, 49 Stat. 674. Such amendment authorized the holder of a valid prospecting permit to "exchange the same for a lease to the area described in the permit without proof of discovery, at a royalty of not less than 12½ per centum." In 1939 the exchange lease was issued to him. In his application therefor, McLaughlin acknowledged by affidavit the interests of the Oldland Group in the permit and stated that such right would be transferred to any lease granted. In approving the issuance of the lease, the Commissioner of the Land Office expressly recited that it was granted in lieu of the existing permit. Thereafter, the lease was transferred by McLaughlin to Gray and one Levison, with knowledge of and subject to the conditions in the permit. In 1943 and before the expiration of the 5-year exchange lease, Levison and Gray applied for and received a new lease, covering the same area, based upon the preference rights granted to them by the amendment to the Leasing Act of July 29, 1942, 56 Stat. 726, which new lease was thereafter assigned to the Phillips Petroleum Company. McLaughlin did not drill the wells, as required by the permit, but kept the permit alive in the name of his assignors. Phillips took the assignment of the new lease with knowledge of McLaughlin's obligation under the original assignment of the underlying permit. The court held that a fiduciary relationship existed between the Oldland Group and McLaughlin and his successors in interest and that the Oldland Group were entitled to a royalty on the production from the new lease, as provided in the assignment of the permit.
 
 
 52
 Thus it will be seen that in Oldland v. Gray there was an express agreement by the assignee to drill and develop, and, as between the parties, the exchange lease took the place of the permit and was subject to the right reserved by the Oldland Group in the permit, and the new lease was obtained during the time the exchange lease was in effect and was a renewal or extension thereof, — factual elements not present in the instant case.
 
 
 53
 The owners of the working interest proceeded with the drilling of Lowder Well No. 1 in the belief that the 30-day lease was still in force and effect. Their failure to more diligently continue the drilling of the well commenced during the primary term of the 30-day lease was not due to bad faith on their part. They acted in good faith in securing the assignment of the Ambassador lease.
 
 
 54
 Since the 30-day lease had terminated before the assignment of the Ambassador lease to Domestic for the benefit of the owners of the working interest, and such lease was obtained by a stranger to the owners of the working interest in the 30-day lease, neither the Ambassador lease nor the assignment thereof could constitute an extension or renewal of a lease that had theretofore terminated and no longer existed. That conclusion is supported by the decision of the Supreme Court of Kansas in K & E Drilling, Inc. v. Warren, 185 Kan. 29, 340 P.2d 919, under facts not materially different from the facts in the instant case.
 
 
 55
 Accordingly, we hold, as did the trial court, that there was no extension or renewal of the 30-day lease and that Haun's rights terminated on the expiration and termination of that lease.
 
 
 56
 The judgment entered in the consolidated cases is affirmed.
 
 
 
 Notes:
 
 
 [1]
 Earp v. Mid-Continent Petroleum Corporation, 167 Okl. 86, 27 P.2d 855, 91 A.L.R. 188; Moody v. Wagner, 167 Okl. 99, 23 P.2d 633, 635; Harper v. Ford, Okl., 317 P.2d 210, 214
 
 
 [2]
 86 C.J.S. Tenancy in Common § 59, p. 422, et seq.; Wallace v. Brooks, 194 Okl. 137, 147 P.2d 784, 790
 
 
 [3]
 Summers Oil & Gas, Perm.Ed., Vol. 1A, § 164, p. 433; Rich v. Doneghey, 71 Okl. 204, 177 P. 86, 89, 3 A.L.R. 352; Commissioner of Internal Revenue v. McKinney, 10 Cir., 87 F.2d 811, 813; Francis v. Superior Oil Co., 10 Cir., 102 F.2d 732, 734; United States v. Stanolind Crude Oil Producing Co., 10 Cir., 113 F. 2d 194, 198
 
 
 [4]
 Rich v. Doneghey, 71 Okl. 204, 177 P. 86, 89; Ohio Oil Co. v. Sharp, 10 Cir., 135 F.2d 303, 307; United States v. Stanolind Crude Oil Purchasing Co., 10 Cir., 113 F.2d 194, 198
 
 
 [5]
 Summers Oil & Gas, Perm.Ed., Vol. 3, § 554, pp. 624, 626; Thornburgh v. Cole, 201 Okl. 609, 207 P.2d 1096, 1098
 
 
 [6]
 Phillips Petroleum Co. v. Oldland, 10 Cir., 187 F.2d 780, 781; Wright v. Brush, 10 Cir., 115 F.2d 265, 267; Keegan v. Humble Oil & Refining Co., 5 Cir., 155 F.2d 971, 973; Thornburgh v. Cole, 201 Okl. 609, 207 P.2d 1096, 1098
 
 
 [7]
 Summers Oil & Gas, Perm.Ed., Vol. 3, § 554, pp. 628-630; Davis v. Lewis, 187 Okl. 91, 100 P.2d 994, 996; Danciger Oil & Refining Co. v. Burroughs, 10 Cir., 75 F.2d 855, 857; National Bank of Tulsa v. Warren, 177 Kan. 281, 279 P.2d 262, 265
 
 
 [8]
 La Laguna Ranch Co. v. Dodge, 18 Cal. 2d 132, 114 P.2d 351, 354, 355, 135 A.L.R. 546; Chase v. Trimble, 69 Cal.App.2d 44, 158 P.2d 247, 249; Belgam Oil Co. v. Wirt Franklin Petroleum Corporation, Tex.Civ.App., 209 S.W.2d 376, 379
 
 
 [9]
 See Priddy v. Thompson, 8 Cir., 204 F. 955, 960, and Oklahoma cases cited in Note 8, infra
 In Oklahoma an oil and gas lease passes no estate to the lessee that can be the subject of ejectment or other like action, Kolachny v. Galbreath, 26 Okl. 772, 110 P. 902, 38 L.R.A.,N.S., 451; Brennan v. Hunter, 68 Okl. 112, 172 P. 49, 50, and the Oklahoma courts hold that a court of equity has jurisdiction to settle the validity and priority of oil and gas leases between contesting lessees, where such leases have been executed by a common landowner. Gypsy Oil Co. v. Marsh, 121 Okl. 135, 248 P. 329, 331, 48 A.L.R. 876.
 
 
 [10]
 50 C.J.S. Juries § 33, p. 748
 
 
 [11]
 Harlan v. Sparks, 10 Cir., 125 F.2d 502, 505-506; Humble Oil & Refining Co. v. Sun Oil Company, 5 Cir., 191 F.2d 705, 718; Lancaster v. Kathleen Oil Co., 241 U.S. 551, 555, 36 S.Ct. 711, 712, 60 L.Ed. 1161
 
 
 [12]
 Humble Oil & Refining Co. v. Sun Oil Company, 5 Cir., 191 F.2d 705, 713
 
 
 [13]
 Trust Co. of Chicago v. Samedan Oil Corp., 10 Cir., 192 F.2d 282, 284; Denker v. Mid-Continent Petroleum Corporation, 10 Cir., 56 F.2d 725, 727; Broswood Oil & Gas Co. v. Mary Oil & Gas Co., 164 Okl. 200, 23 P.2d 387, 389; Ramsey Petroleum Corporation v. Davis, 184 Okl. 155, 85 P.2d 427, 429; Newell v. Phillips Petroleum Co., 10 Cir., 144 F.2d 338, 339
 
 
 [14]
 31 C.J.S. Estoppel § 109 a., p. 347; 15 Okl.St.Anno. § 75; Federal Mining & Engineering Co. v. Pollak, 59 Nev. 145, 85 P.2d 1008, 1012; Wood Naval Stores Exp. Ass'n. v. Latimer, 220 Miss. 652, 71 So.2d 425, 430; See also, Elsey v. Wagner, 199 Okl. 449, 183 P.2d 829, 830
 
 
 [15]
 Summers Oil & Gas, Perm.Ed., Vol. 3, § 554, pp. 634-637; Wier v. Glassell, 216 La. 828, 44 So.2d 882, 887, 888; Keese v. Continental Pipeline Company, 5 Cir., 235 F.2d 386, 388; Phillips Petroleum Company v. McCormick, 10 Cir., 211 F. 2d 361, 364; La Laguna Ranch Co. v. Dodge, 18 Cal.2d 132, 114 P.2d 351, 355, 135 A.L.R. 546
 
 
 [16]
 Summers Oil & Gas, Perm.Ed., Vol. 3, § 554, p. 635
 
 
 [17]
 Summers Oil & Gas, Perm.Ed., Vol. 3, § 554, pp. 637-641
 
 
 [18]
 Kile v. Amerada Petroleum Corporation, 118 Okl. 176, 247 P. 681, 683; Phoenix Oil Co. v. Mid-Continent Petroleum Corporation, 177 Okl. 530, 60 P.2d 1054, 1061