**PIAMCO, INC., an Illinois corporation, Plaintiff-Appellee,**

v.

**SHELL OIL COMPANY, a Delaware corporation, Defendant-Appellant.**

Nos. 85–2251, 85–3207.

United States Court of Appeals, Seventh Circuit.

Argued June 11, 1986.

Decided July 29, 1986.

As Amended Sept. 11, 1986.

David P. List, Eugene A. Schoon, P.C., Sidley & Austin, Chicago, Ill., for appellee.

Larry R. Eaton, Peterson, Ross, Schloerb & Seidel, Chicago, Ill., for appellant.

Before WOOD and COFFEY, Circuit Judges, and SWYGERT, Senior Circuit Judge.

SWYGERT, Senior Circuit Judge.

Plaintiff-appellee Piamco, Inc. is in the business of assembling mineable coal properties by acquiring coal leases from land owners. By October 1974 Piamco had acquired coal mining rights to 5,228 coal-rich acres near the town of Elkhart, Illinois. On October 24, 1974 defendant-appellant Shell Oil Company and Piamco entered into a Coal Reserve and Royalty Agreement ("the Agreement"). Under the terms of the Agreement Piamco agreed to sell and convey to Shell rights, title, and interest to its existing coal leases in the area. Article I, Section 1.02 of the Agreement provides that the purchase price for these rights is $467,000 plus advance and minimum royalties as provided in Article II; and earned royalties as provided in Article III. Section 1.03 obligated Piamco to use its best efforts over the course of the next fifteen months ("the acquisition period") to acquire and assign to Shell at least 59,772 additional acres in the same general area ("the reserve"). Any additional acreage would also be transferred to Shell. Under section 1.04 Shell agreed to pay $9.00 per acre for administrative costs; the actual cost to Piamco of initial payments to landowners; and the actual costs incurred in making acquisitions. In addition Shell agreed to pay Piamco an advance and minimum royalty as provided in Article II, and earned royalties as provided in Article III. Article II provided in full:

It is understood and agreed that Piamco reserves and retains and is entitled to advance and minimum royalties on rights acquired by Shell in the Reserve pursuant to Article I of this Agreement, at the rate of $4.00 per acre per year for a period of 15 years commencing on the last day of the month following the Acquisition Period. For leases transferred to Shell pursuant to the provisions of Section 1.03 after the Acquisition Period, advance and minimum royalties for such leases shall begin on the last day of the month following such transfer. The obligation of Shell to pay such royalties shall be subject to the provisions of Section 7.01 hereof.

Article III of the Agreement provided that Piamco would be paid an earned royalty of five cents per ton of coal mined, removed, and sold from the reserve. Article IV declared that the obligation to pay royalties "shall operate both as an obligation of Shell and as a covenant running with the land." Shell also agreed in Article IV that it would not divest itself of any of its rights to the reserve "except to a purchaser, assignee or transferee that is reasonably financially able to carry out its obligation to pay such advance and minimum and earned royalties." Article VII, section 7.01 provided that if Piamco failed to transfer at least 50,000 reserve acres within the acquisition period Shell could terminate all the leases transferred and cease the payment of royalties. Finally, section 7.02 provided that:

Shell shall have the right after the Acquisition Period to sell, assign, transfer or convey such leases subject to the provisions of Article IV. After the Acquisition Period Shell shall have the right to terminate any lease provided, however, that if Shell shall terminate all or substantially all of such leases it shall first offer to assign, transfer and convey the same to Piamco without cost to Piamco.

Unlike section 7.01, section 7.02 does not mention the termination of royalty payments.

After entering into the Agreement Piamco acquired and transferred rights to 107,740 acres located in the reserve. On January 30, 1984 Shell released its rights to 42,845 acres. Shell paid advance and minimum royalties only on the remaining 64,192 acres in the amount of $256,768. Piamco demanded and was refused payment on the remaining 42,845 acres.

On March 28, 1984 Piamco filed a two-count complaint against Shell in the United States District Court for the Northern District of Illinois. Count I sought a declaration that Shell was obligated to make royalty payments on the 42,845 acres Shell had released. Count II sought recovery of a $171,387 payment Shell had failed to make on January 31, 1984 and prejudgment inter-

est on that amount. In August 1984 Piamco moved for judgment on the pleadings. On June 25, 1985 the district court reserved ruling on Piamco's request for prejudgment interest, stating that Piamco could move for an award of interest in supplemental proceedings within twenty days. On July 10, 1985 Piamco did indeed move for prejudgment interest. On July 18 Shell filed its notice of appeal. On September 9, 1985 the district court nevertheless awarded Piamco prejudgment interest. On November 18, 1985 the amount of the interest was set at $11,996.74. On December 20, 1985 Shell appealed that decision. Shell's two appeals have been consolidated.

## I

On appeal Shell makes two basic arguments. On the merits of the contract claim Shell argues that section 7.02 of the Agreement authorized it to terminate any number of the leases at will and thus operated to relieve it of the duty to pay royalties on the portion of the released leases. On the prejudgment interest claim Shell argues that the filing of its first notice of appeal stripped the district court of jurisdiction to enter an order affecting this case. We turn first to the contract claim.

■ Shell advances three reasons as to why it should not be held to have breached the Agreement. First, Shell asserts that the advance and minimum royalties referred to in the Agreement are actually a form of "overriding royalty." Overriding royalties are common in the oil and gas industry and have been defined as "... a fractional interest in the gross production of oil and gas under a lease, in addition to the usual royalties paid to the lessor. ..." *Meeker v. Ambassador Oil Co.*, 308 F.2d 875, 882 (10th Cir.1962). "It is an interest carved out of the lessee's share of the oil and gas, ordinarily called the working interest, as distinguished from the owner's reserved royalty interest." *Id.* There can be no doubt that as a general matter overriding royalty obligations end with the termination of the estate from which the interests were carved, absent an express contractual provision to the contrary. But we believe that in this case Shell makes entirely too much out of a label. The district court seemed to agree that the royalty payments embodied in the Agreement could be classified as "overriding royalties." But the court went on to hold that the Agreement itself manifested a clear intention to bind Shell to make such royalty payments regardless of the fate of the underlying leases. We agree.

Article II of the Agreement expressly binds Shell to pay advance and minimum royalties for fifteen years subject only to the limitations of section 7.01. That section of the Agreement, however, only provides Shell with a remedy in the event of Piamco's failure to secure leases to at least 50,000 acres. In addition, Article IV prohibits Shell from ridding itself of its rights except to a purchaser financially able to carry out Shell's obligations to pay advance, minimum, and earned royalties. Construed as a whole, the contract unambiguously manifests an intent to bind Shell to make advance and minimum royalty payments even if it later relinquished its rights to a part of the acreage. The advance and minimum royalty payments constitute a part of the purchase price of the rights and not a bonus dependent on Shell's exercise of the rights secured from Piamco.

Second, Shell asserts that section 7.02 of the Agreement is ambiguous in regard to Shell's obligation to continue to pay advance and minimum royalties upon termination of the unilateral underlying leases. Such ambiguity, Shell contends, must be construed against its drafter. *Advance Process Supply Co. v. Litton Industries Credit Corp.*, 745 F.2d 1076, 1079 (7th Cir. 1984). The affidavit of a Shell employee alleges that the Agreement was written by agents of Piamco. Assuming, *arguendo*, that the document was, in fact, drafted by Piamco we nevertheless do not believe it is legally ambiguous and that we must punish its drafter. When read in conjunction with the contract as a whole, section 7.02 is fully consistent with our view that Shell remained obligated to pay Piamco advance

and minimum royalties. Moreover, assuming, *arguendo*, that the agreement contains some minor ambiguities Shell is hardly a party that needs our special protection. Shell is one of the world's leading energy producers. Surely, Shell is a sophisticated enough consumer of energy-related services to protect itself against an ambiguous contract.

Third, in the alternative, Shell argues that section 7.02, instead of being ambiguous, quite clearly permits the unilateral termination of its royalty obligations. At the risk of repeating ourselves, we believe the contract as a whole establishes the contrary. The judgment of the district court that Shell remained obligated to Piamco for advance and minimum royalty payments is affirmed.

## II

■ Shell's argument regarding the awarding of prejudgment interest is based on *Asher v. Harrington*, 461 F.2d 890 (7th Cir.1972), wherein is stated the general rule that the filing of an appeal vests exclusive jurisdiction in the court of appeals. The district court relied on *Terket v. Lund*, 623 F.2d 29 (7th Cir.1980), in which this court held that the issue of entitlement to attorney's fees could be decided by the district court during the pendency of an appeal. In *Terket* we stated that the attorney's fee inquiry

> is not the sort of reconsideration of the merits which could lead to altering the substantive judgment or in any way interfere with the pending appeal.... Thus the policy against two courts treating the same issues concurrently does not require withdrawing the district court's power to decide attorney's fees motions while an appeal is pending.

623 F.2d at 34. In *Kaszuk v. Bakery & Confectionary Union*, 791 F.2d 548 (7th Cir.1986), however, this court held that a decision of a district court that determines liability, but does not resolve the issue of prejudgment interest, is not appealable. Nevertheless, the district court's decision in this case to calculate prejudgment inter-

est is not reversible error, nor is this court deprived of jurisdiction over the case. Under *Kaszuk* a judgment that does not fully specify interest is not a final order. The June 25, 1985 order of the district court granting judgment on the pleadings on the question of liability alone was, therefore, not a final order and not appealable. Consequently, Shell's first notice of appeal on July 18, 1985 did not affect the right of the district court to later calculate prejudgment interest. The district court's final disposition of the case occurred on November 18, 1985 when the amount of interest was fixed. Shell's July 18, 1985 notice of appeal, while premature, preserved its objection to the determination of liability. Shell's appeal from the December 20, 1985 order brought the entire case before this court. We see no reason to alter the district court's calculation. The award of $11,996.74 in prejudgment interest is affirmed.