**BLACK BUTTE COAL COMPANY,
Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 91–1079L.

United States Court of Federal Claims.

March 1, 1993.

Mary Anne Sullivan, Washington, D.C., for plaintiff. George W. Miller and Charles J. Felker, of counsel.

Lisa K. Hemmer, with whom was Peter Schaumberg, Washington, D.C., for defendant. Geoffrey Heath and Howard Chalker, U.S. Dept. of the Interior, of counsel.

## OPINION

BRUGGINK, Judge.

This matter is before the court on cross-motions for summary judgment. Jurisdiction is proper based on the Tucker Act[1] and subsection 304(c) of the Federal Land Policy and Management Act of 1976.[2] *See Foote Mineral Co. v. United States*, 228 Ct.Cl. 230, 232–33, 654 F.2d 81, 84–85 (1981); *Marathon Oil Co. v. United States*, 16 Cl.Ct. 332, 335 (1989). The issue to be decided is whether plaintiff correctly calculated the royalties it owed the Government on a coal mining lease between February 1980 and the present.

## BACKGROUND

In March 1976, Rosebud Coal Sales Co. ("Rosebud") and the Government, acting through the Department of the Interior ("DOI"), entered into a lease whereby Rosebud acquired the privilege to mine coal on certain federal lands in Wyoming effective April 1, 1976. The document executed by Rosebud and DOI was not a standard form lease. It was unique, negotiated during a general moratorium on coal leasing. The lease provided that in exchange for coal mining privileges, Rosebud would pay a ten percent royalty based on the gross value of the coal "at the point where the coal is delivered from the pit."

1. 28 U.S.C. § 1491 (1988).

2. 43 U.S.C. § 1734(c) (1988).

Section 5 of the lease provides for a production royalty. The charge is "10 percent of the gross value of the Coal produced," but at least $.50 per ton during the first decade of the lease and $.60 during the second. Gross value is calculated in the following manner:

5(b) The Lessee agrees that the Lessor shall determine the gross value of the Coal produced from the Leased Lands for the purpose of Subsection 5(a) as follows:

(1) The gross value shall be considered to be the price received by the Lessee, adjusted for transportation and/or processing costs so that it is a measure of the value of the Coal at the mine mouth (or in the case of strip mining that point where the Coal is delivered from the pit)....

(2) The Area Mining Supervisor may make deductions from gross values for costs of preparing and transporting Coal which are incurred by the Lessee between the mine mouth, or in the case of strip mining that point to which the Coal is first delivered from the pit, as designated by the Supervisor, and the point of sale. He will make such deductions only when, in his judgment and subject to his audit, the Lessee provides him with an accurate account of the costs so incurred.

The parties' principal disagreement concerns the application in section 5(b)(1) of the adjustment for "transportation and/or processing costs so that it is a measure of the value of the Coal at the mine mouth."

Rosebud assigned its rights under the lease to Black Butte Coal Co. ("plaintiff" or "Black Butte") on June 18, 1976, as part of a package that included both federal and nonfederal lands. Black Butte agreed to the reservation of an overriding royalty at fifty percent of the federal royalty. This was the maximum overriding royalty allowed under section 19 of the lease, which limited overriding royalties as follows:[3]

3. The limitation echoed a regulation in effect when the lease was negotiated. *See* 43 C.F.R. § 3503.3–2(c)(3)(i) (1975).

The Lessee shall not create, by assignment or otherwise, an overriding royalty interest in excess of 50 percent of the rate of royalty payable to the United States under this Lease or an overriding royalty interest which when added to any other outstanding overriding royalty interest exceeds that percentage, except that where an interest in the Leased Lands or in an operating agreement is assigned, the assignor may retain any overriding royalty interest in excess of 50 percent if he shows to the satisfaction of the Bureau that he has made substantial investments for improvements on the Leased Lands covered by the assignment.

Subsequently, a cap was added so that Black Butte's total royalty payment (both federal and overriding) on the federal coal would not exceed the royalty on the non-federal coal, which was ten percent of the sales price.[4] The royalty on federal lands was thus calculated at a higher percentage than the royalty on adjacent private lands, but against a lower net figure, based on value at the mine.

Black Butte began coal production at the site in February 1980. During the course of the lease, a dispute arose as to certain of the transportation and processing costs that Black Butte claimed were properly deductible in computing the royalties due. Specifically, Black Butte asserts that in order to determine value at the minehead, it had the right to deduct from gross value (1) its overriding royalty payments, (2) a portion of its black lung tax payments, (3) a portion of its reclamation fee payments, and (4) a number of other costs not directly at issue here.

Plaintiff's coal production process consists of three phases: mining, transportation, and processing. In the mining phase, the coal is unearthed, drilled and blasted, then loaded into coal haulers and taken to the lip of the pit for transport. The transportation phase involves moving the coal from the lip of the pit to a central processing plant by means of coal haulers and overland conveyors. In the processing phase, the coal is crushed, blended, re-crushed, stored, sprayed with oil, and either placed directly onto railcars or brought to a location adjacent to railcars for shipment to the purchaser. At this point, Black Butte's role is complete and the sale is concluded.

To adjust "for transportation and/or processing costs," Black Butte used what it calls "standard cost accounting principles." First, it grouped costs into three main categories: "direct costs, indirect costs, and other business costs/overhead." It defines direct costs as those "directly related to the physical work of the production process.... includ[ing] labor, equipment, and supply costs." Indirect costs, plaintiff states, can be subdivided into "assigned indirect costs" and "common overhead" or "administrative costs." Costs that "can be traced to specific production-related work, and thus to a specific phase of production" are treated as assigned indirect costs. Such costs are assigned to the phase or phases to which they can be traced. By contrast, costs that cannot be traced to any particular part of the operation but apply to the whole process are categorized as common overhead or administrative costs. Plaintiff apportions such costs pro rata among all phases of production. Black Butte's claim here is that those costs apportioned to transportation and processing are properly deducted from the sales price and thus indirectly reduce the federal royalty.

Before this court, the Government's quarrel with Black Butte's accounting procedures is limited to plaintiff's classification of the costs it incurred in paying reclamation fees, black lung taxes, and over-

---

**4.** Rosebud has since assigned the overriding royalty to the Kiewit Royalty Trust. The parties stipulate that "[t]he 'cap' on the total royalties was negotiated in a 'letter agreement between Peter Kiewit Sons' Inc. and Rocky Mountain Energy Company imposing a cap on the overriding royalty.'" Joint Stip. Facts ¶ 10 (quoting Admin.R. 13, Ex. 6A ¶ 2). Rocky Mountain Energy Co. is the parent company of Bitter Creek Coal Co., which holds the nonfederal lands that Rosebud leased and then assigned to plaintiff as part of the package that also included the federal lease at issue. *See Black Butte Coal Co.,* 103 I.B.L.A. 145, 153 (July 21, 1988).

riding royalties. Plaintiff classifies its black lung tax and reclamation fee payments as common overhead or administrative costs proportionally distributable to each phase of production. On the other hand, it classifies the overriding royalty it pays to Rosebud as an "assigned indirect cost" wholly attributable to the transportation and processing phases. Thus, under plaintiff's accounting system, the first two expenditures are partially deductible insofar as they are allocated to the transportation or processing phases, while its overriding royalty payments are entirely deductible from the sales price.

On March 15, 1984, following an audit of Black Butte's royalty filing records by the Royalty Compliance Division, the Minerals Management Service ("MMS") demanded that plaintiff pay an additional $3,875,189 for royalties allegedly owing. MMS disputed all of plaintiff's deductions for transportation and processing costs. Black Butte appealed to the Director, MMS, who on November 27, 1985, issued an order agreeing with plaintiff that the lease permitted certain deductions based on transportation and processing costs, but disagreeing as to which deductions to allow. The Director held that plaintiff could deduct some, but not all of its direct costs. He also prohibited the deduction of overhead costs not directly attributable to transportation and processing phases. He refused to allow plaintiff to deduct any portion of the black lung tax, reclamation fee or overriding royalty, but allowed plaintiff to deduct a proportionate share of its management fees allocable to the transportation and processing phases.

Dissatisfied, plaintiff appealed to the DOI Board of Appeals ("Board" or "IBLA"). The IBLA partially allowed plaintiff's claim as to the remaining direct costs of transportation and processing, but refused to permit deductions for the over-

riding royalty, black lung tax, or reclamation fees. The Board stated as follows:

Appellant has confused the question of whether costs are directly attributable to a specific phase with the issue of how they are computed. The obligation to pay the reclamation fee and the black lung tax arises solely from appellant's mining of the coal. Or, to utilize appellant's terminology, the expenditure *is* directly "caused" by the mining phase. This is readily apparent if one assumes that, rather than transport and process coal, appellant sold the freshly mined coal at the mine mouth to a third party. In such a situation appellant, as the operator, would be totally liable for the reclamation fee and the black lung tax. The individual who purchases the unprocessed coal would be assessed no costs therefor. Clearly, therefore, the costs of these assessments arise not from the general operation but from the specific act of mining. In this regard, the precedents are well-settled: production, severance taxes, reclamation fees and the like are properly considered to be a cost of production and may not be subtracted from the gross value for Federal royalty computation cases.

. . . .

Moreover, since royalty has generally been defined as a share of the production reserved to another party, free of the costs of production, royalty has been held to be a component of the value of the coal at the mine *not* to be apportioned between mining and processing.

*Black Butte Coal Co.*, 103 I.B.L.A. at 157–58 (emphasis in original).[5] Thereafter, plaintiff paid the Government $6,977,960.11 to cover the royalties allegedly due between February 1980 and February 1989 and sought a refund in this court. Plaintiff also seeks refund of the royalties it has paid on overriding royalty, black lung tax and reclamation fees since February 1989.

---

5. The Board remanded a separate issue, the deductibility of plaintiff's cost of capital, for consideration by the Director, MMS. That issue subsequently was resolved by agreement of the parties. The following year, DOI petitioned the Board for review of the Director, MMS's decision. In that second IBLA proceeding, the Board affirmed the Director's determination that plaintiff could deduct operating and maintenance expenses, depreciation of transportation and processing equipment and a return on undepreciated investment based on the prime interest rate. 111 I.B.L.A. 275 (Oct. 26, 1989). No issues from that appeal are before us.

## DISCUSSION

This case comes to us on appeal from an action of the Secretary, DOI represented by the IBLA decision of July 21, 1988. The court's review is limited to the administrative record. *Marathon Oil Co. v. United States,* 17 Cl.Ct. 116, 120 (1989); *Hedman v. United States,* 15 Cl.Ct. 304, 320 (1988). The case turns on the interpretation of the terms within the lease. Such interpretations are questions of law. The proper standard of review is set by the Administrative Procedure Act, 5 U.S.C. §§ 701–706 (1988). *See Foote Mineral Co.,* 228 Ct.Cl. at 234, 654 F.2d at 85. While the IBLA's decision generally is entitled to deference as to findings of fact, no findings of fact are disputed. Moreover, whatever deference to which the Board might otherwise be entitled as to interpretive matters within its expertise is lessened in this case by DOI's inconsistent interpretations of,[6] and its monetary interest in, the lease. *See National Fuel Gas Supply Corp. v. Federal Energy Regulatory Comm'n,* 811 F.2d 1563 (D.C.Cir.), *cert. denied,* 484 U.S. 869, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987).

■ The Government raises an initial question regarding DOI's discretion to reject asserted cost deductions. It draws support from both the lease and from mining regulations. As to the former, it points to the introductory language in subsection 5(b) of the lease, "the Lessor shall determine the gross value of the Coal," and portions of subsection 5(b)(2), "[t]he Area Mining Supervisor may make deductions from gross values for costs of preparing and transporting Coal which are incurred by the Lessee.... He will make such deductions only when, in his judgment and subject to his audit, the Lessee provides him with an accurate account of the costs...." The Government argues that these provisions gave DOI absolute discretion to disapprove deductions taken under the lease. If the Government is correct, the court has no interpretive role to play in this case. However, subsection 5(b)(1) provides that "[t]he gross value shall be considered to be the price received by the Lessee, adjusted for transportation and processing costs...." Plaintiff has a right to enforce the terms of its contract. Acceptance of defendant's interpretation that the agency maintained absolute discretion over royalty deductions effectively would render the clause defining gross value illusory, reducing it to a mere suggestion to DOI.

Section 5(b)(2) of the contract parallels the relevant statutory and regulatory provisions, 30 U.S.C. § 207(a) (1988) and 30 C.F.R. § 203.200(h) (1987). Subsection 207(a) provides that coal leases "shall require payment of a royalty in such amount as the Secretary shall determine of not less than 12½ per centum of the value of coal as defined by regulation.... The lease shall include such other terms and condi-

---

6. As plaintiff's counsel noted at oral argument, the administrative interpretations of which deductions were allowed under section 5(b)(1) of the lease have fluctuated widely over the last ten years, as the following chart reveals:

| Year | Authority | Deductions |
|---|---|---|
| 1984 | Mining Supervisor | –No deductions at all. |
| 1985 | Director, MMS | –Direct costs after coal is dumped into the grizzly chute. <br> –Some indirect costs, but not others; no cost of capital. |
| 1988 | IBLA (103 I.B.L.A. 145) | –Direct costs from point where coal is loaded on trucks. <br> –Some indirect costs, but not others; remand of cost of capital issue. |
| 1989–90 | IBLA (second appeal) (111 I.B.L.A. 275) and settlement agreement | –Direct costs from point where coal is loaded on trucks. <br> –Additional indirect costs, including significant portion of cost of capital, but not other indirect costs. |

tions as the Secretary shall determine." 30 U.S.C. § 207(a). The relevant portion of 30 C.F.R. § 203.200 reads as follows:

> If additional preparation of the coal is performed prior to sale, such costs shall be deducted from the gross value in determining value for Federal royalty purposes. The District Mining Supervisor will allow such deductions only when, in his judgment and subject to his audit, the operator/lessee provides an accurate account of the costs incurred.

30 C.F.R. § 203.200(h), *repealed by* 54 Fed. Reg. 1492 (1989) (as codified at 30 C.F.R. § 206.257 (1989)); *see also* 43 C.F.R. § 3485.2(h) (1987) (substituting "authorized officer" for "District Mining Supervisor," but otherwise identically worded), *repealed by* 54 Fed.Reg. 1492. Neither the statute nor the regulation points to the type of unfettered discretion for DOI that the Government advocates. The statute defers coal valuation to the regulation, and the regulation permits the District Mining Supervisor discretion only to verify the accuracy of costs claimed by the "operator/lessee" to be deductible. The basis for rejection in this proceeding, however, is not the inaccuracy of supporting data, but a disagreement over the meaning of lease terms. The court concludes that neither the lease nor the regulation were intended to give the District Mining Supervisor the exclusive power to interpret the lease.

■ We now come to the central issue of this case, namely, the interpretation of the following language in section 5(b)(1) of the lease:

> The gross value shall be considered to be the price received by the Lessee, adjusted for transportation and/or processing costs so that it is a measure of the value of the Coal at the mine mouth (or in the case of strip mining that point where the Coal is delivered from the pit).

The Government maintains that the meaning of "adjusted for transportation and/or processing costs" leaves no room for the allocation of items of general overhead such as black lung taxes, reclamation fees and overriding royalties to those deductible phases. It argues that those costs do not derive from processing and transportation activities, but are rather costs which plaintiff has assigned to those elements of its mining operations as a paper accounting practice. Plaintiff, on the other hand, directs the court's attention to the latter part of the clause. It contends that inclusion of the phrase, "so that it [the gross value] is a measure of the value of the Coal at the ... point where the Coal is delivered from the pit," reflects that the goal of section 5(b)(1) is to permit adjustment not only for the direct costs of transportation and processing, but also for indirect costs such as black lung taxes, reclamation fees and overriding royalties. These indirect costs, plaintiff says, are properly attributable to the transportation and processing phases by application of standard cost accounting principles.

The IBLA held that the contract permitted plaintiff to deduct assigned indirect or overhead costs associated with the transportation and processing phases.[7] We concur. The fact that indirect costs are not specifically mentioned as deductible in the lease does not preclude their deduction. Like direct costs, indirect costs can add to the value of the coal. Unless indirect costs associated with the transportation and processing phases are deducted, the gross value will include increments of value added

---

7. The IBLA worded its standard for deducting indirect costs as follows: "we do not disagree with appellant's theoretical argument that, under the specific terms of its lease, it may deduct so much of general overhead expenses which are properly allocable to the transportation and processing phase...." *Black Butte Coal Co.,* 103 I.B.L.A. at 156.

Previously, the Director, MMS had affirmed plaintiff's use of "generally accepted accounting principles" in articulating its standard for deductibility: "[i]n calculating value for royalty purposes, Black Butte may deduct from its sales price direct and indirect costs, as determined by generally accepted accounting principles, and approved by MMS, which are directly attributable to transportation ... and processing activities...." *Black Butte Coal Co.,* MMS–84–0009–MIN at 9 (Nov. 27, 1985). Thus, both the Director, MMS and the IBLA found that no portion of the three expenses were deductible because they were not "directly attributable" to the transportation and processing phases, but could be traced to the mining phase.

after the coal is delivered from the pit. The goal of the adjustment, as discussed above, is to assess royalties based on the "measure of the value of the Coal at the ... point where the Coal is delivered from the pit." Thus, to be deductible, the value of the coal must have been increased by indirect costs incurred during the transportation and processing phases.

What are the indicia that an indirect cost has added value during a particular phase of production? The answer to that question is not clear from the record or the parties' argument. Instead, the parties have asserted the relevance of a somewhat differently phrased inquiry, namely, are there direct links between a disputed cost and a specific phase of production? For example, plaintiff recites that items of common overhead "cannot be traced to specific production-related work." Duree Aff., ¶ 47. Thus, what plaintiff characterizes as common overhead is not common overhead if it in fact can be traced to a specific phase of plaintiff's operation. Black Butte concedes that under its accounting system, indirect costs not directly traceable to the transportation and processing phases are not deductible if they can be directly traced to the mining phase.

The court fundamentally agrees with the plaintiff's inquiry. The question is, what types of "causal" links or factual connections are the best indicators of whether the value added during production can be legitimately assessed against one particular phase? The most important indicia the court can discern is whether liability for payment of the tax or royalty can be linked to a particular phase of production. A related consideration would be whether the method of calculating the payment shows a linkage to one specific aspect of production as against others.

### 1. Black Lung Taxes.

■ The federal black lung tax was first imposed by the Black Lung Benefits Revenue Act of 1977, Pub.L. No. 95–227, § 2(a), 92 Stat. 11 (1978) (codified as amended 26 U.S.C. § 4121 (1988)). The tax was levied to provide care and financial support for miners stricken by pneumoconiosis and their families when the employer cannot be held responsible.[8]

The tax originally was assessed against producers at the point of sale at a rate of twenty-five cents per ton for coal from surface mines (plaintiff's type of mining operation), and fifty cents per ton for coal from underground mines.[9] The Act did not define "producer." However, a corresponding regulation issued by the Internal Revenue Service ("IRS") in October 1980 contained the following definition:

(a) *Imposition of tax*—(1) *In general.* Section 4121(a) imposes a tax on coal mined at any time in this country if the coal is sold or used by the producer after March 31, 1978.... For purposes of this section, the term "producer" means the person in whom is vested ownership of the coal under state law immediately after the coal is severed from the ground, without regard to the existence of any contractual arrangement for the sale or other disposition of the coal or the payment of any royalties between the producer and third parties. The term in-

---

8. The Black Lung Benefits Reform Act of 1977, Pub.L. No. 95–239, § 7, 92 Stat. 95 (1978), entitled miners and their survivors to benefits if the miner became disabled due to pneumoconiosis after being employed for thirty years (twenty-five years for anthracite) or more in an underground mine, or under conditions substantially similar to an underground mine. A miner is defined as follows:

[A]ny individual who works or has worked in or around a coal mine or coal preparation facility in the extraction or preparation of coal. Such term also includes an individual who works or has worked in coal mine construction or transportation in or around a

coal mine, to the extent such individual was exposed to coal dust as a result of such employment.

Black Lung Benefits Reform Act of 1977, § 2(b) (codified at 30 U.S.C. § 902 (1988)).

9. In 1986, the rates were amended so that surface-mined coal is taxed at the point of sale at the rate of $.55 per ton, and coal from underground mines is taxed at $1.10 per ton. Both rates are subject to a cap at 4.4% of the producer's price per ton. Budget Reconciliation Act of 1986, Pub.L. No. 99–272, Title XIII, § 13203(a), 100 Stat. 312, 313 (codified at 26 U.S.C. § 4121 (1988)).

cludes any person who extracts coal from any coal waste refuse piles or from the silt waste product which results from the wet washing (or similarly processing) of coal. However, the excise tax does not apply to a producer who sells the silt waste product without extracting the coal from it, or to the producer who uses the silt waste product without extracting the coal from it. Furthermore, the excise tax does not apply to the sale or use of the silt waste product after any coal has been extracted from it.

Treas.Reg. § 48.4121–1(a)(1) (1981).

Under plaintiff's analysis, the black lung tax cannot be traced to any particular phase. Therefore, it is properly categorized as common overhead and must be assigned pro rata to each of the three phases. The portions allotted to transportation and processing, plaintiff further contends, should then be deducted from gross value under section 5(b) of the lease.

Plaintiff's principle argument in support of its analysis is that the tax applies to processed coal at the point of sale, thus suggesting that the tax is imposed on the entire production process. The difficulty with this argument is that it ignores the fact that liability for the tax is fixed at the point that the coal is extracted from the ground or from a refuse pile, irrespective of the value added by the transportation and processing phases. Collection of the tax at the time of sale is merely a convenience for those entities taxed, not an indication that the tax is affected by transportation and processing. In the words of the Board, "[Black Butte] has confused the question of whether costs are directly attributable to a specific phase with the issue of how they are computed. The obligation to pay the ... tax arises solely from [Black Butte]'s mining of the coal." *Black Butte Coal Co.*, 103 I.B.L.A. at 157.

The definition of "producer" found in Treas.Reg. § 48.4121–1(a)(1), set out above, reveals that the tax is traceable only to the mining phase. Under the regulation, a "producer" is the entity who owns the coal immediately after it is either severed from the ground or extracted from "coal waste

refuse piles" or "silt waste product." The regulation demonstrates the IRS's interest in taxing entities responsible for extracting coal from the ground or waste materials. No interest in taxing coal transportation and processing appears. The plain import of Treas.Reg. § 48.4121–1 is that if plaintiff were involved in coal transportation and processing alone, it would not be subject to the tax.

■ Citing *Davis v. United States*, 758 F.Supp. 474 (S.D.Ill.1991), *aff'd*, 972 F.2d 869 (7th Cir.1992), plaintiff responds that the tax is aimed not at the act of mining, but at the producer's potential liability for black lung claims. Plaintiff contends that in *Davis*, the black lung tax was imposed on entities who had nothing to do with mining coal. In *Davis*, the plaintiffs extracted, transported and processed coal from abandoned waste materials at an old coal production facility. As such, the IRS held them liable for the black lung tax under the theory that they qualified as producers under Treas.Reg. § 48.4121–1. The plaintiffs filed an action to recover their black lung tax payments, arguing that the regulation was inconsistent with § 4121. The United States District Court for the Southern District of Illinois disagreed. The court held that taxation of plaintiff's coal extraction operations did not render the regulation unreasonable despite exceptions made for other types of operations such as lignite production or riverbed dredging. Lignite production, the court found, likely had been exempted from the tax because taxation would render it too expensive. Riverbed dredging, unlike the plaintiff's extraction operations, involved the recovery of coal that had already been subject to the tax. Thus, the court determined that the regulation's inclusion of coal extraction operations like plaintiff's was not inconsistent with § 4121. *Davis* does not assist plaintiff. While the plaintiffs in *Davis* were not engaged in mining per se, they did extract coal from waste products. Extraction of coal from a waste product is an activity specifically subject to

the black lung tax; coal transportation and processing is not.[10]

Thus, liability for the tax is traced directly to extraction, and the method of calculating the tax is not dependent on transportation or processing. We therefore hold the black lung tax entirely attributable to the non-deductible mining phase rather than to all phases pro rata. In terms of plaintiff's cost accounting practices, the tax is an "assigned indirect cost" rather than an item of general overhead because it is entirely traceable to the mining phase.

### 2. Reclamation Fees.

■ Congress imposed the reclamation fee pursuant to the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. §§ 1201–1328 (1988). The fee helps provide for the Abandoned Mine Reclamation Fund, a federal trust set up to rehabilitate resources lost to previous mining activities. See 30 U.S.C. § 1231(c). Such resources include lands and waters affected not only by coal mining, but also by coal transportation and processing. 30 U.S.C. §§ 1231(c), 1233–1234.[11] By the terms of 30 U.S.C. § 1232(a), the fee is set at "35 cents per ton of coal produced by surface coal mining

and 15 cents per ton of coal produced by underground mining or 10 per centum of the value of the coal at the mine, as determined by the Secretary, whichever is less." It applies to "[a]ll operators of coal mining operations subject to the provisions of this chapter." § 1232(a). Section 1291(28) defines "surface coal mining operations" as follows:

(A) activities conducted on the surface of lands in connection with a surface coal mine or subject to the requirements of section 1266 of this title[,] surface operations and surface impacts incident to an underground coal mine, the products of which enter commerce or the operations of which directly or indirectly affect interstate commerce. Such activities include excavation for the purpose of obtaining coal including such common methods as contour, strip, auger, mountaintop removal, box cut, open pit, and area mining, the uses of explosives and blasting, and in situ distillation or retorting, leaching or other chemical or physical processing, and the cleaning, concentrating, or other *processing* or preparation, loading of coal for interstate commerce at or near the mine site ... and

---

**10.** In dicta, *Davis* quotes the Secretary of the Treasury in Private Letter Ruling 8451016, dated September 12, 1984:

"[I]f an employer's activities relating to the processing or production of coal render his employees eligible for black lung benefits ... in the event they later contract black lung, and render the employer potentially liable for the payment of such benefits, this should be viewed as support for finding that the employer's sales of coal produced from those activities are subject to the tax imposed by section 4121."

*Davis*, 758 F.Supp. at 477. However, while private letter rulings of the IRS may be helpful in ascertaining the agency's practices, they hold no precedential weight. *Rowan Cos. v. United States*, 452 U.S. 247, 261 n. 17, 101 S.Ct. 2288, 2296–97 n. 17, 68 L.Ed.2d 814 (1981); *Xerox Corp. v. United States*, 228 Ct.Cl. 406, 408 n. 3, 656 F.2d 659, 660 n. 3 (1981).

**11.** Section 1231(c) provides, in pertinent part, as follows:

Moneys in the fund may be used for the following purposes:

(1) reclamation and restoration of land and water resources adversely affected by past coal mining, including but not limited to rec-

lamation and restoration of abandoned surface mine areas, abandoned coal processing areas, and abandoned coal refuse disposal areas....

30 U.S.C. § 1231(c).

Section 1233 provides, in pertinent part, as follows:

Expenditure of moneys from the fund on lands and water eligible pursuant to section 1234 of this title for the purposes of this subchapter shall reflect the following priorities in the order stated:
....

(5) the protection, repair, replacement, construction, or enhancement of public facilities such as utilities, roads, recreation, and conservation facilities adversely affected by coal mining practices....

30 U.S.C. § 1233.

Section 1234 provides, in pertinent part, as follows:

Lands and water eligible for reclamation or drainage abatement expenditures under this subchapter are those which were mined for coal or which were affected by such mining, wastebanks, coal processing, or other coal mining processes, and abandoned or left in an inadequate reclamation status....

30 U.S.C. § 1234.

(B) the areas upon which such activities occur or where such activities disturb the natural land surface. Such areas shall also include any adjacent land the use of which is incidental to any such activities, all *lands affected by the construction of new roads or the improvement or use of existing roads* to gain access to the site of such activities and *for haulage,* and ... entryways ... *processing areas,* shipping areas and other areas upon which are sited structures, facilities, or other property or materials on the surface, resulting from or incident to such activities....

30 U.S.C. § 1291(28) (emphasis added); *see also* 30 C.F.R. § 700.5 (1987).

Those engaged in coal transportation and processing are thus potentially liable along with those engaged in coal mining. The reclamation fee potentially could have been collected from plaintiff even if it were engaged in transportation and processing alone. Moreover, the mischief which Congress intended to address clearly includes damage done at processing and transportation sites. By paying the fee, plaintiff helps to provide for a fund which benefits lands and waters it might later abandon or otherwise be unable to repair.

*United States v. Tri–No Enterprises,* 819 F.2d 154 (7th Cir.1987), supports our interpretation of the scope of the reclamation fee. There, the Court of Appeals for the Seventh Circuit held that an entity which is not actually engaged in coal mining still engages in "surface coal mining operations" simply by loading and hauling away stockpiled coal. *See also United States v. Kennedy,* 806 F.2d 111 (7th Cir. 1985) (per curiam) (extraction, loading and hauling of coal mining waste). Similarly here, plaintiff's transportation of coal over a twelve-mile network of roads and a sev-

en-mile conveyor system and the processing of that coal in a company-owned plant are "surface coal mining operations" within the meaning of § 1291(28).

Another decision supporting our analysis of the reclamation fee is *Amax Coal Co. v. Wyoming State Board of Equalization,* 819 P.2d 825, 830 (Wyo.1991). In *Amax,* the operator of a surface coal mine and processing facility and the State of Wyoming both petitioned for review of a decision by that state's board of equalization ("state board") construing state tax provisions requiring mine operators to perform calculations substantially similar to those required by the lease in this case.[12] The state board refused to allow the operator to deduct a portion of its black lung taxes, but allowed the deduction of reclamation fees. The operator's position was that black lung taxes and reclamation fees were attributable not only to the nondeductible mining phase of its operation, but also to the deductible processing phase. As to the reclamation fee, the Wyoming Supreme Court adopted the following statement by the State Board of Equalization:

"Reclamation costs attributable to processing operations are costs attributable to processes after the product leaves the mine mouth.... Unless reclamation costs are partially allocated to processing and deducted, there will be an increment of value in the sales price which represents cost[s] added to mine mouth value that are associated with activities which are beyond the mine mouth and not attributable to mining, and thus inappropriate."

*Amax Coal Co.,* 819 P.2d at 834. Likewise in the present case, if plaintiff is not allowed to deduct the portion of its reclamation fees attributable to transportation and processing, it will be paying federal royal-

---

12. *Amax* interprets provisions of the Wyoming state constitution, Wyo. Const. art. XV, § 3, and a corresponding statute, Wyo Stat. § 39–2–202(a), (b) and (d) (1987), under which ad valorem coal taxes are assessed based on the value of the coal at the mine. To comply with the law, taxpayers are required to perform net-back accounting calculations, by which their costs are attributed over various phases of production (e.g., mining, transportation, and processing). Thus, although

*Amax* and cases like it do not entail computation of royalties pursuant to a federal lease, they are useful because they wrestle with some of the same questions that occur in analyzing the propriety of plaintiff's net-back accounting deductions under the lease. *See also Hillard v. Big Horn Coal Co.,* 549 P.2d 293, 299 (Wyo.1976) (addressing the proper attribution of royalty payments) (discussed *infra* p. 710).

ties based in part on value added to the coal beyond the mine mouth, contrary to section 5 of the lease.

The Government relies on *Peabody Coal Co. v. Hopi Indian Tribe*, 72 I.B.L.A. 337 (Apr. 29, 1983), and *Knife River Coal Mining Co.*, 43 I.B.L.A. 104 (Sept. 24, 1979) (*"Knife River II"*) to support the general proposition that reclamation fees are per se nondeductible when calculating federal royalty payments. In *Peabody Coal Co.*, the plaintiff, Peabody Coal Co. ("Peabody") executed coal leases with the Navajo and Hopi Indian Tribes. Both leases stated that royalties on the coal would be paid at the higher of $.25 per ton of coal produced or a percentage of the gross realization. The leases defined "gross realization" as "the gross sales price at the mining site without any deduction therefrom of overhead sales costs or any other business expenses." Two years into the lease, the Office of the Inspector General issued the results of an audit it had conducted on Peabody. The audit stated that Peabody owed nearly $250,000 in unpaid royalties, in part because it had deducted reclamation fees and other costs in violation of the lease. Peabody refused to alter its practice, and eventually appealed to the IBLA. The IBLA held that Peabody should have included the reclamation fee in calculating its royalty payment because it passed the cost along to its customers and thus was reimbursed for that amount.

*Peabody* is not on point. Although the lease required a valuation of the coal at the mining site, it specifically disallowed a deduction of "overhead sales costs or any other business expenses." The IBLA held that the reclamation fee was an "overhead sales cost" or "other business expense" and therefore was expressly nondeductible under the *Peabody* lease. The case is thus not relevant here because of the difference in the terms of the lease.

In *Knife River II*, the operator of a coal mining facility appealed from an adverse decision by the United States Geological Survey ("GS") that reclamation fees were to be included in the gross value of coal under a federal lease that assessed royalty payments based on the value of the coal "at the point of shipment to market." Before the IBLA, the operator asserted that the fee added no value to the coal, therefore its inclusion in gross value resulted in an unfair benefit to the United States. The operator also claimed that exclusion of the fee was proper because it did not exist when the parties executed the lease, and therefore was not contemplated. The IBLA held that the reclamation fee increased the gross value of the coal because the operator adjusted the sales price to cover the fee. Furthermore, the parties did contemplate that value would be equated with gross sales price. Accordingly, the IBLA affirmed the GS decision.

*Knife River II* is inapposite. The royalty calculation in that case prompted no reason to distinguish the mining phase from the transportation and processing phases. Royalties were calculated at the point of shipment to market—i.e., beyond the transportation and processing phases. There was no contractual basis, as there is here, for reducing the sales price by the costs of transportation and processing. The operator wished to deduct the entire fee from its royalty payments, not just a part of the fee attributable to a particular phase. The fact that the IBLA correctly concluded that value at the point of sale included value added by the reclamation fee does not preclude plaintiff's argument here. The analysis in *Knife River II* did not call for distinctions to be drawn as to where that value was added.

To summarize, § 1291(28) and *Tri–No* reveal that liability for payment of reclamation fees is not triggered by operating a mine only. Liability also can be triggered by transporting and processing mined coal. Furthermore, the fee is intended to remedy the harm from, and to benefit lands disturbed by, all phases of the mining operation. Consequently, we must conclude that the reclamation fee does not embrace mining alone; it is attributable to all three phases of plaintiff's operation. Plaintiff was therefore justified in deducting the prorated portion of the reclamation fee that was attributable to the transportation and processing phases of its operation as an

assigned indirect cost. We therefore reverse the holding of the Board with regard to this issue.

### 3. Overriding Royalty.

A royalty is defined as a "share of the product reserved by the owner of land for permitting another to use his property, and is a right to receive in kind or in money equivalent a stipulated fraction of the mineral products." *Hillard v. Big Horn Coal Co.,* 549 P.2d 293 (Wyo.1976). In *Hillard,* the Supreme Court of Wyoming addressed whether royalties had been properly attributed in calculating state coal production taxes on a federal lease.[13] In concluding that royalties could not be deducted, the court taught the following:

> [R]oyalt[ies] must be paid for the privilege of mining, not processing.... [A] royalty is a full component of the value of the coal at the mine, and is not to be apportioned between mining and processing as indirect costs may be.

*Hillard,* 549 P.2d at 301–02.

For the purposes of this case, the court sees no principled distinction between an initial royalty and an overriding royalty. An "overriding royalty" has been defined as a royalty reserved to the lessor or assignor in addition to the royalty usually reserved by the landowner. *See Meeker v. Ambassador Oil Co.,* 308 F.2d 875, 882–83 (10th Cir.1962), *rev'd on other grounds,* 375 U.S. 160, 84 S.Ct. 273, 11 L.Ed.2d 261 (1963); *Portwood v. Buckalew,* 521 S.W.2d 904, 912 (Tex.Civ.App.1975). Like other royalties, it is a nonpossessory interest in real property. *See Meeker,* 308 F.2d at

882; *Danciger Oil & Ref. Co. v. Burroughs,* 75 F.2d 855, 857 (10th Cir.), *cert. denied,* 295 U.S. 758, 55 S.Ct. 915, 79 L.Ed. 1700 (1935); *Robichaux v. Bordages,* 48 S.W.2d 698, 705 (Tex.Civ.App.1932); *Taylor v. Higgins Oil & Fuel Co.,* 2 S.W.2d 288, 295 (Tex.Civ.App.1928); *see also United States v. Noble,* 237 U.S. 74, 80, 35 S.Ct. 532, 534–35, 59 L.Ed. 844 (1915); *Bellows Falls Trust Co. v. American Mineral Prods. Co.,* 89 N.H. 551, 3 A.2d 98, 102 (1938); 58 C.J.S. *Mines and Minerals* § 193 (1948). And, like any other mineral royalty, it is an interest in the product at the surface, free of the costs of production. *See Meeker,* 308 F.2d at 882; *Cline v. Angle,* 216 Kan. 328, 532 P.2d 1093, 1097 (1975); *Alamo Nat'l Bank v. Hurd,* 485 S.W.2d 335, 339 (Tex.Civ.App.1972).

Thus, an overriding royalty, like all other types of royalties, is paid for the privilege of mining coal, not for transporting or processing it.[14] As an interest in the coal that vests immediately upon extraction, there is no reason to attribute its costs to other activities.

Plaintiff asserts that the unique circumstances of this overriding royalty lead to a different result, however. In support, it offers the affidavit of its accountant, Stephen Duree. Mr. Duree's brief and rather confusing statement, along with arguments offered by plaintiff's counsel and a single month's royalty calculation figures, represents all the information we have regarding the overriding royalty.[15] Mr. Duree states:

> Black Butte's production from the Lease is subject to both the federal royal-

---

**13.** *See supra* note 12 with respect to Wyoming coal production taxes.

**14.** At oral argument, plaintiff suggested that in this case, its overriding royalty payments compensated Rosebud not so much for the privilege of mining as for Rosebud's "staying power" through a tedious negotiation process. The reasons for which the overriding royalty was imposed do not affect what it is. In any event, plaintiff offers no reason why its overriding royalty payments are properly attributable to the transportation and processing phases.

**15.** The record does not contain the following items reviewed by Mr. Duree:

1. "A copy of the Rosebud Coal Sales Company lease assignment to Black Butte Coal Company retaining an overriding royalty."
2. "[A] copy of the assignment of the overriding royalty from Rosebud Coal Sales Company to the Kiewit Royalty Trust."
3. "[A] copy of a letter agreement between Peter Kiewit Sons, Inc., and Rocky Mountain Energy Company imposing a cap on the overriding royalty."
4. "Documents summarizing the accounting systems and procedures applied by Black Butte."
5. "Summaries of royalty filings, as periodically submitted by Black Butte to MMS." Admin.R. 13, Ex. 6A.

ty and an overriding royalty. The overriding royalty is equal to 50% of the federal royalty, subject to a cap such that the total royalty payable on the federal coal production does not exceed the royalty rate applicable to the non-federal coal. In effect, the overriding royalty makes that portion of the coal value not subject to the 10% federal royalty, *i.e.*, the value added by transportation and processing costs, subject to a separate royalty of either 10% or an amount immaterially different from 10%.*

Because both the federal and overriding royalty are essentially 10%, the *pro rata* allocation of the combined royalty to mining value (federal) and transportation and processing (overriding) is appropriate. In effect, the federal royalty cost is assigned directly to mining, and the overriding royalty cost is assigned directly to transportation and processing. This is consistent with "cause and effect" and "benefits received" principles,

and it results in no part of the federal royalty being deducted from the value on which the royalty is calculated.

*For all years for which final data is available except 1981 and 1984, a total royalty of 10% has been paid on all coal—federal and non-federal—produced at Black Butte. Because of the interrelationship of the two limitations on the overriding royalty, a rate of approximately 10.20% applied to the 1981 federal production, and a rate of approximately 9.87% applied to the 1984 federal production. These minor deviations are immaterial to my analysis.

Duree Aff., ¶¶ 53–54.

The force of this argument is lost on the court. Apparently, plaintiff concedes that the overriding royalty would have been attributable to the mining phase if it were simply calculated at fifty percent of the federal royalty, because the federal royalty is an assigned indirect cost identified to the mining phase.[16] It is the effect of the cap negotiated between Peter Kiewit Sons' Inc. and Rocky Mountain Energy Co., which, according to plaintiff, changes the result.[17]

---

16. As plaintiff stated in its initial brief:

[T]he federal royalty is assessed solely on the mined value of the coal, without transportation and processing. Accordingly, no part of the federal royalty obligation is deductible in calculating the value of the coal at the point of delivery from the pit.

Pl.'s Mot. Summ. J., p. 26.

17. At oral argument, plaintiff's counsel attempted to clarify its argument during the following colloquy with the court:

MS. SULLIVAN: The federal royalty applies to the mining value of the coal.
. . . .
THE COURT: And, you can add 50 percent of that. Now, just looking at it in the abstract and think 50 percent of the mining value—
MS. SULLIVAN: But, only up to ten percent of the total sales price. And, so, the difference between the mining value and the total—
THE COURT: Excuse me, only up to ten percent. The overriding royalty plus the federal royalty cannot exceed ten percent of the gross sales price.
MS. SULLIVAN: That's correct.
. . . .
THE COURT: Well, it is a simple mathematic formula, and if you say 50 percent of X, and if X is calculated based on mining value, then why does the 50 percent of that X have to be based on anything other than the value in the mine?
MS. SULLIVAN: That 50 percent is subject to a further limit, and the further limit is the

ten percent of gross sales price for total royalty.... You can [see] that the federal coal bears a total royalty that can't exceed ten percent of gross sales price, and the federal royalty element of that is the mining value, and difference.... between the federal royalty and the total royalty is derived from the value added by transportation and processing.
. . . .
Let me try again. The cap, the ten percent of gross sales price is where you start. The federal royalty is the mining value. The overriding royalty can only be associated—which is computed off of sales price.... It can only come out of the [processing] and transportation, because, otherwise, it would exceed the limit that the parties have agreed to.
. . . .
THE COURT: Why do you have to go into this calculation about assigning that overriding royalty just to the value after processing?
MS. SULLIVAN: Because, the overriding royalty is assessed on the sales price. It is assessed at the point of sale on the sales price. In general, that means you then ... have to allocate it to the points in the production process that it accrued at.
. . . .
The parties decided to agree to an even lower amount, a lower cap, potential cap. In other words they are two alternate caps.... They are alternate, and it is the lower of which—whichever is lower is the.... controlling one.

The outcome of this analysis is obvious, if anomalous: plaintiff, by virtue of its position as assignee of the lease, would be in a better financial position vis-a-vis the lessor than Rosebud, the original lessee, because it could offset overriding royalty payments against the sales price in calculating the federal royalty. Mr. Duree's explanation, insofar as the court understands it, offers no logical rationale for such an outcome. If the initial, federal royalty is totally attributable to the mining phase, then a royalty based on a percentage of the federal royalty would appear to be no less attributable to the mining phase. Likewise, if the overriding royalty is totally attributable to the mining phase when it is based on a percentage of the federal royalty, then it should be no less attributable to the mining phase merely because it is capped. *See Amax*, 819 P.2d at 830 (rejecting a similar argument for the deductibility of the mine operator's black lung tax based on a percentage of sales price rather than a per-ton basis rendering it attributable to the mining phase alone).[18]

Plaintiff contends that because the royalty on federal lands (both initial and overriding) is roughly equal to the royalty on nonfederal lands (which is assessed at ten percent of the sales price) and because the federal royalty is entirely attributable to the mining phase, it follows that the overriding royalty must be attributable to transportation and processing. But plaintiff has shown no basis for making such a leap of logic. As government counsel pointed out at oral argument, numeric equality is not evidence of causation:

A $10,000 car is a $10,000 car. A $10,000 house is a $10,000 house. They may be equal [in value] to each other, but that doesn't make the car a house.

Tr. Oral Arg., Jan. 6, 1993, pp. 35–42.

**18.** The *Amax* court stated as follows:

There is no question that the [black lung] tax is attributable solely to mining operations and is not allocable to processing or transportation activities when coal is priced such that it is taxed at the specified rate of fifty-five cents per ton.... In effect, Amax argues that the 4.4% limitation applicable to lesser priced coal ... creates a "window of opportunity" for a coal producer to allocate a portion of

The fact that there is an equality there that [was] imposed unilaterally after the lease was created does not make the overriding royalty a cost of transportation or processing.

Tr. Oral Arg., Jan. 6, 1993, p. 70. Absent proof that the overriding royalty is somehow traceable to the transportation and processing phases, the fact that attributing the overriding royalty to those phases would balance plaintiff's allocation of the federal royalty to the mining phase is not probative. It is merely coincidental.

Mr. Duree suggests an alternative argument, namely, that overriding royalties can be categorized as an unassigned overhead cost. This contention is not discussed in plaintiff's briefs, but comes exclusively from Mr. Duree's affidavit. His argument assumes that the primary royalty would also be treated as unassigned overhead. Having created a common royalty pool, Mr. Duree then contends that by allocating those costs pro rata, transportation and processing, in effect, absorb an amount equal to the overriding royalty. The defect in this argument is that it is based on an incorrect assumption. As Mr. Duree himself notes, royalty charges "can also be related to particular production phases and thus could be allocated on a specific 'cause and effect' basis." There is therefore no need to treat royalty costs as overhead that cannot be specifically assigned. As we explain above, both royalty payments are directly and exclusively attributable to the mining phase. Accordingly, they cannot be deducted in arriving at the gross value of the coal.

## CONCLUSION

Defendant's motion is denied with regard to the reclamation fees, but granted as to

the [tax] to non-mining activities—specifically transportation and processing.

We fail to find any rationale or authority for changing the character of the tax simply because the coal sells for a lower price. If the full [black lung tax] is attributable solely to mining activities when coal is taxed at the fifty-five cents per ton rate, then it is equally attributable solely to mining activities under the 4.4% protective limitation for less expensive coal.

*Amax Coal Co.,* 819 P.2d at 830.

the black lung and overriding royalty claims. Plaintiff's motion is granted with regard to the reclamation fees, but denied as to the black lung and overriding royalty claims. The parties are directed to attempt to reach agreement on the amount of the judgment by Friday, March 26, 1993. A joint status report is due on that date.