**FLORIDA POWER CORPORATION,**
**Plaintiff,**

v.

**UNITED STATES, Defendant.**

**No. 542–88 L.**

United States Court of Federal Claims.

March 29, 1995.

legal representative from a final judgment, order, or proceeding for the following reasons: ... (4) the judgment is void....

Daniel H. Israel, Denver, CO, for plaintiff.

Margaret Sweeney, Environmental and Natural Resources Div., General Litigation Section, Dept. of Justice, Washington, DC, attorney of record for defendant. Howard W. Chalker, Dept. of the Interior, of counsel.

## OPINION

HORN, Judge.

This case comes before the court on cross-motions for summary judgment. On May 23, 1977, the plaintiff, Florida Power Corporation (Florida Power), entered into a purchase agreement with Gulf Oil Corporation (Gulf), a predecessor to Chevron Resources Company (Chevron), for uranium produced on Native American allottee lands, pursuant to leases entered into by Gulf. Plaintiff claims a refund from the United States for payments made by Florida Power to Chevron pursuant to the purchase agreement entered into by the two companies to cover royalty payments paid by Chevron to the United States for uranium production on leased lands. Defendant contests jurisdiction in this court. Because defendant's cross-motion for summary judgment refers to matters outside the pleadings to support its argument that this court lacks jurisdiction to entertain plaintiff's claim, defendant's motion was filed as a summary judgment motion, rather than as a *motion to dismiss. See* Rules of the United States Court of Federal Claims (RCFC) 12(c).[1] In the alternative, in its motion for summary judgment, defendant argues that it is entitled to summary judgment on the merits. After careful consideration of the facts, the documents submitted by both parties, the

---

1. Rule 12(c). **Motion for Judgment on the Pleadings.** After the pleadings are closed, but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56 and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

oral arguments presented to the court, the relevant law, and for the reasons stated below, the plaintiff's motion for summary judgment is, hereby, DENIED, and the defendant's cross-motion for summary judgment is, hereby, GRANTED.

### FACTS

On May 23, 1977, the plaintiff, Florida Power, entered into a uranium concentrate purchase agreement with Gulf, the predecessor to Chevron. Under the purchase agreement, Florida Power was to acquire all the uranium ore produced pursuant to two Native American allottee leases (BIA Contract Nos. 14–20–0603–1345 and 14–20–0603–1351),[2] issued to Gulf on May 14, 1968 and May 21, 1968, respectively.

Pursuant to these allottee leases, a royalty was to be paid to the Bureau of Indian Affairs for the benefit of the lessors, calculated on a monthly weighted average, on the basis of dry short tons of ore mined and delivered to the treatment plant, subject to certain adjustments and calculations, also specified in the leases. The provisions regarding royalty and delayed sale in both allottee leases are identical and can be found in Part III, section (1) and Exhibit A of both leases. Those provisions contain the following language:

IN CONSIDERATION OF THE FOREGOING, THE LESSEE AGREES:

(1) ROYALTY—To pay, or cause to be paid, to the Bureau of Indian Affairs ... for the use and benefit of the lessor [Native American allottee], a royalty as follows: per attached Exhibit "A".

\* \* \* \* \* \*

EXHIBIT "A"

ROYALTY. To pay or cause to be paid ... a royalty calculated on a monthly weighted average on the basis of dry short tons of ore mined and delivered to a treatment plant.

\* \* \* \* \* \*

1. (b) *For uranium and vanadium and associated minerals.*

For uranium and vanadium and associated minerals the net value or net return ... shall be the gross value per dry ton of crude ore at the mine as paid for by a custom mill or other buyer.

In the case of a captive lease where the lessee sells products derived from crude ores, net value or net return shall be determined by deducting from the gross value of the product sold the actual costs of transportation of crude ore from the mine to the beneficiation plant plus the actual costs of beneficiation. It is specifically understood that any mine production bonuses and subsidies shall be included in determination of net value or net return.

Also, in the case of a captive lease, the lessee, at the time of determination of uranium content of the ore, shall pay royalty based upon a value of $6 per pound of the content of [uranium ore]. If the product is sold within twelve months from the date of determination of the uranium content of the ore, the royalty value shall be adjusted to the sales price. If the product is not sold within twelve months from the month of the determination of uranium content of the ore, the royalty value shall be subject to adjustment in accordance with subparagraph (c) hereof but not below $6 per pound of $U_3O_8$ or its equivalent.

According to the terms of the purchase agreement between Florida Power and Gulf, plaintiff agreed to buy and take delivery of uranium concentrates, pursuant to quantity and delivery schedules specified in the purchase agreement. Article 5 of the purchase agreement, which addresses "Prices, Price Adjustments and Terms of Payment," contains the following language:

5.2.1 ... When the Mariano Lake Mine is no longer producing, adjustments on any Concentrates Seller holds in storage shall be made as described in Article 5.2.11. This adjustment corresponds to storage charges.

\* \* \* \* \* \*

2. Although the complaint and the other documents included in the record only refer to two leases, the appeal decision issued by the United States Department of the Interior, dated December 31, 1986, also identifies a third BIA Lease, No. 14–20–0603–1349.

5.2.11 When the Mariano Lake Mine permanently ceases to produce, as determined by Seller, the price for Production held in storage by Seller for future delivery under Article 3.1 shall be subject to adjustment upward to compensate Seller for Seller's costs of storing such Production in inventory. Such Production will be of two kinds: that which has been received as Concentrates by the Allied Chemical Conversion Facility, and that which has not yet been received as Concentrates by the Allied Chemical Conversion Facility.

Under the terms of the May 23, 1977 purchase agreement, Gulf was obligated to deliver to Florida Power 3,200,000 pounds of uranium concentrate, with an annual delivery schedule of 400,000 pounds per year for each of eight years. The record reflects that deliveries in 1978 and 1979 were made as scheduled. With Gulf's February 1980 delivery to Florida Power, however, Gulf's inventory of uranium concentrate from the Mariano Lake Mine was depleted, and Gulf was unable to fully perform under the purchase agreement. As a result, two modifications to the purchase agreement between Gulf and Florida Power were issued. In the first amendment, plaintiff Florida Power agreed to accept a portion of the delivery from another month. Subsequently, on February 15, 1982, the parties modified the purchase agreement to require the delivery of only 2,000,000 pounds of uranium concentrate and to provide for some delayed deliveries.

As part of the purchase agreement modifications, the parties agreed that 400,000 pounds of uranium concentrate in Gulf's inventory would be stored by Gulf, after beneficiation, off the leased premises, for a period of up to 445 days. According to the 1977 purchase agreement, Florida Power was to reimburse Gulf for the charges associated with storing the uranium. Gulf ultimately delivered the uranium to Florida Power 445 days late, and Florida Power took actual possession in August 1983. The record also reflects that Florida Power reimbursed Gulf in the amount of $2,789,408.00 for the storage charges associated with the delayed deliveries.

In a decision dated October 11, 1985, the Minerals Management Service (MMS) determined that the royalties on account of the allottee leases (45–001345 and 45–001351)[3] had been underpaid in the amount of $697,-352.08, attributable to the storage charges paid by Florida Power to Gulf. Furthermore, the MMS decided that late payment charges also were owed.[4] The October 11, 1985 MMS decision explained the government's reasons for the inclusion of reimbursed storage charges in the determination of the royalty fees as follows:

GMRC [Gulf Mineral Resources Company] received $2,789,408.33 for 445 days of storage charges from the purchaser of Mariano Lake Mine uranium, Florida Power Corporation (FPC).

30 CFR 231.61, redesignated on August 12, 1983, as 43 CFR 3577.2, states that:

'The gross value for royalty purposes shall be the sale or contract unit price times the number of units sold....'

The contract between FPC and GMRC defines a base price which, among other things, includes a storage adjustment as stated in the following excerpt from Section 5.2.1:

'The base prices for $U_3O_8$ contained in concentrates stated in Article 5.1 are also subject to adjustment upward for storage charges.'

The $2,789,408.33 is, therefore, a part of the contract price and per 43 CFR 3577, [sic]2, royalties are due on this amount.

\* \* \* \* \* \*

3. In the papers filed in this court, the plaintiff uses the lease numbers which appear on the original leases signed on May 14, 1968 and May 21, 1968. The MMS and the defendant, however, have used a somewhat different numbering system to describe the leases at issue, although the last four digits used by the MMS and the defendant are the same as the last four numbers which appear on the leases.

4. The dollar amounts used in the plaintiff's complaint and the dollar amounts used in the MMS decision issued by the Department of the Interior are inconsistent. This case, however, can be decided on summary judgment without fully reconciling the different numbers which appear in the record.

The storage fee was part of the consideration received for the uranium sales and, therefore, it must be included as a part of gross proceeds for royalty purposes.

\* \* \* \* \* \*

Costs for transportation and beneficiation are deductible as stated in the lease terms and in the Gulf Decision IND–45–MIN. The storage fee, on the other hand, is not a cost allowed in the lease terms. The storage fee is a reimbursement for the delayed sale which in effect is the cost associated with the time value of money. This is an ordinary cost of doing business which is not deductible for royalty purposes. The value of the ore at the mine is the contract price less deductions for transportation and beneficiation. Not every cost of getting the product to market is deductible, and in this case, the storage costs should not be deductible.

\* \* \* \* \* \*

The reimbursement for storage is similar to the mine production bonuses and subsidies specifically referred to in the lease terms because these are revenues which are the result of the mining activity and, therefore, are revenues for royalty purposes.

The provisional royalties paid by GMRC are in effect estimated payments which are called for in the following section of the lease terms:

'Also, in the case of a captive lease, the lessee, at the time of determination of uranium content of the ore, shall pay royalty based upon a value of $6 per pound of the content of $U_3O_8$ or its equivalent hereinafter called 'product.' If the product is sold within 12 months from the date of determination of the uranium content of the ore, the royalty value shall be adjusted to the sales price. If the product is not sold within 12 months from the month of the determination of uranium content of the ore, the royalty value shall be subject to adjustment in accordance with subparagraph (c) hereof but not below $6 per pound of $U_3O_8$ or its equivalent. All deliveries from product inventory shall be assumed to be from the earliest addition remaining in the product inventory.'

These terms do not limit the MMS's right to collect royalties on the proceeds of the sale, i.e., the storage fee reimbursement. The lease terms merely call for estimated payments which are adjusted to reflect the sales price and thus these payments are just a component of the total royalties actually due.

The additional royalties due for this discrepancy total $697,352.08.

In November 1985, Chevron, a legal successor to Gulf, filed a notice of appeal of the October 11, 1985 decision issued by the MMS Lakewood Regional Compliance Office with the Office of the MMS Director. Chevron's notice detailed the following basis for its appeal:

Chevron Resources Company ("Chevron"), acting by and through its attorneys, Holland & Hart, hereby appeals the above-referenced decision. The decision was issued by the Acting Regional Manager, Lakewood Regional Compliance Office of the Minerals Management Service ("MMS") on October 11, 1985. This decision determined that Gulf Mineral Resources Company ("Gulf"), to whom Chevron is the successor, had underpaid royalties on account of Indian Uranium Lease Nos. 45–001345 and 45–001351 in the amount of $834,049.72.

On December 31, 1986, the Office of the Secretary, United States Department of the Interior, issued a decision, signed by Ross Swimmer, Assistant Secretary, Indian Affairs, upholding in part, and reversing in part, the October 11, 1985 MMS decision. The December 31, 1986 decision reversed the October 11, 1985 MMS decision regarding lease concentrates and nonlease production, issues unrelated to the action in this court. Assistant Secretary Swimmer's December 31, 1986 decision, however, upheld the finding by the MMS that reimbursements for storage charges should have been included as part of the consideration paid for the uranium, and, therefore, that the reimbursed storage charges should have been included in valuation of the royalty fees. The December 31, 1986 decision explained:

In determining the royalty value, the leases provide that the net return or net value shall be the value paid for uranium products less the 'actual costs of transportation of crude ore from the mine to the beneficiation plant plus the actual costs of beneficiation.' The lease provisions are clear that these are the only costs to be deducted from the concentrate price in determining the royalty value of the 'crude ore at the mine.'

Moreover, § 231.61 of 30 CFR in effect during the period establishes that

The gross value for royalty purposes shall be the sale or contract unit price times the number of units sold * * *.

By its terms, the Florida Power contract expressly includes in the price amounts incurred as storage charges.

In its statement of appeal, Chevron has argued that the storage charge reimbursements in question were not the kind contemplated by § 5.2.11 as an adjustment to the base price. The Company contends that the storage charges were paid separately as compensation for delay encountered in assuring that the higher Florida Power price would be preserved for the remaining 400,000 pounds of concentrates when the contract volumes were curtailed in February 1982.

The February 1982 amendment provides that the price for the 400,000 pounds is to be computed in accordance with the terms of the original agreement. The Appellant's characterization of the payment does not alter the fact that the consideration was received pursuant to a contract that includes storage charge reimbursements in the price.

Chevron also points to the delayed sale provisions of the leases as evidence that the storage charge payments should not be included in the royalty value. The Appellant states

The inclusion by the government of an express provision controlling the amount and timing of royalty payments in the event of a delayed sale or no sale prevents the government from seeking additional royalty solely on the basis of delay.

In this regard, the leases anticipate possible delayed sales and provide for initial payments of royalty based upon a floor value of $6.00 per pound. The provisions do not operate to exclude any form of proceeds in establishing the royalty value. The reimbursements are part of the consideration paid under the contract and must be included in the valuation. The RMP [Royalty Management Program] determination with respect to the storage charges is affirmed, and this portion of the appeal is denied.

In a letter dated June 9, 1987, Assistant Secretary for Indian Affairs, Ross Swimmer, denied Chevron's January 20, 1987 "Motion to Determine Amount of Royalty." In effect, Assistant Secretary Swimmer treated Chevron's motion as a motion for reconsideration of the December 31, 1986 Department of the Interior decision. Mr. Swimmer wrote:

This is in response to your 'Motion to Determine Amount of Royalty and Interest Due' filed after the appeal was decided on December 31, 1986. You have asked for reconsideration of the decision on its merits and offer additional arguments in support of the appeal.

Your substantive contentions in this regard should have been introduced during the appeal proceeding. Moreover, we have no record of any appeal of the related interest assessment. Our review of this matter has been completed, and the motion is denied in all respects.

Because this decision is issued by an Assistant Secretary of the Department of the Interior, it is not subject to appeal to the Interior Board of Land Appeals and is the final action of the Department. *Blue Star, Inc.,* 41 IBLA 333 (1979).

On September 19, 1987, Chevron filed a complaint against the Secretary of the Interior in the United States District Court for the District of New Mexico. The complaint was captioned *Chevron USA, Inc., a Pennsylvania Corporation, formerly known as Gulf Oil Corporation, vs. Donald Hodel, Secretary of the Interior.* Chevron sought a declaration under the Administrative Procedure Act that the Secretary's withholding of the additional

royalty fees and of the interest charges was arbitrary and contrary to law, and requested the court to order that the defendant return the collected monies. In an order dated November 6, 1987, the District Court granted Chevron's unopposed motion to substitute Florida Power Corporation as the party plaintiff in place of Chevron. Starting on November 6, 1987, the case in the District Court was captioned *Florida Power Corporation, a Florida Corporation vs. Donald Hodel, Secretary of the Interior.*[5]

On December 4, 1987, the Secretary moved to dismiss the case in the District Court, now being prosecuted in the name of Florida Power Corporation, contending that the protested monies had been disbursed during the pendency of the appeal, and that if Florida Power was entitled to a refund, such claim for relief would lie in the United States Claims Court (now the United States Court of Federal Claims).[6]

The District Court, therefore, transferred the action to this court, pursuant to 28 U.S.C. § 1631 (1988). The District Court found that it lacked jurisdiction because Florida Power's claims sought money damages from the United States, which only could be asserted in the United States Claims Court. Moreover, the District Court noted that "the parties mutually acknowledged that jurisdiction lies in the United States Claims Court."

Subsequently, Florida Power alone initiated the instant case in the United States Court of Federal Claims by filing an amended complaint on October 11, 1988, captioned *Florida Power Corporation, a Florida Corporation vs. United States of America.* Plaintiff claims jurisdiction is proper in this court pursuant to the Tucker Act, 28 U.S.C. § 1491, 25 U.S.C. §§ 2, 9 and 396, 25 C.F.R. §§ 1.2—2.20, 212, 30 C.F.R. §§ 290.1 *et seq.,* and related federal regulations found in 43 C.F.R. §§ 3577.2(a) and (b). Plaintiff also alleges that defendant's actions were in violation of uranium allottee lease numbers 14–20–0603–1345 and 14–20–0603–1351. Jurisdiction, however, is contested by the defendant as part of its motion for summary judgment.

In the amended complaint filed in this court, plaintiff also claimed that it was entitled to compensation for an impermissible taking in violation of the Fifth Amendment to the United States Constitution. At the oral argument on the cross-motions for summary judgment, however, plaintiff's counsel withdrew Florida Power's claim that a Fifth Amendment taking had occurred. Plaintiff's counsel stated, "I do not think we have a take [sic] in this case here, even though I made that claim." Further, when the court inquired as to why plaintiff's counsel had failed to notify either the court or the defendant prior to the oral argument that plaintiff no longer claimed a Fifth Amendment taking, counsel offered the following attempt at an explanation:

> MR. ISRAEL: Well, I think really just in the last week I decided reviewing all this that it just did not—you know, I re-read the cases, the whole notion in my gut

---

5. Paragraph 15 of the complaint filed by plaintiff in this court is misleading in that it describes the complaint in the District Court as having been filed by Chevron and plaintiff Florida Power. *The complaint states:*

> Believing that the Secretary has no right under federal law to charge the additional royalty and to impose an additional interest penalty, Chevron *and* Florida Power filed a federal court action in the United States District Court for the District of New Mexico on September 17, 1987 seeking a declaration, under the Administrative Procedure Act, that the Secretary's withholding of the additional royalty and the interest charges was arbitrary and contrary to law, and an order returning the unlawfully collected monies. *Florida Power Corporation v. Hodel,* Civ. No. 9–1211–JC. [Emphasis added.]

6. By enactment of the Court of Federal Claims Technical and Procedural Improvements Act of 1992, Pub.L. No. 102–572, the United States Claims Court was renamed the United States Court of Federal Claims. In accordance with General Order 33 issued by the United States Court of Federal Claims, the court adopted the rules of the United States Claims Court. The substance of the rules of the court, discussed herein, is unaffected by the legislation, other than with respect to the name change of the court and, therefore, the name change of the rules. General Order 33, however, also indicates that if there is a conflict between the new statute and the rules, the statute will control. RUSCC stands for Rules of the United States Claims Court, now the Rules of the United States Court of Federal Claims, which are abbreviated RCFC.

that this was an unauthorized act by the assistant secretary and, you know, I—

\* \* \* \* · \* \*

Right. Well, the true conclusion is that I put both in because I was confronted with a set of facts I had not seen in the case law and, you know, in my effort to kind of streamline this for the Court because it has been stale, you know, I do not think it is a particularly good claim because I do not think anybody can justify the secretary's action as being an authorized action. I mean it is a disputed royalty. What set of facts would—

\* . \* \* \* \* \*

To that extent, to be perfectly candid, I think my willingness and my resolution of moving ahead just on the 1491 claim really has emerged in the last week. But, you know, it is true I could have communicated that fact to both the Justice Department—

In its supplemental brief filed in support of its argument on jurisdiction, plaintiff confirmed its statements made at the oral argument, as follows: "Florida Power hereby confirms in writing its statement made before the Court on October 16, 1992 that it withdraws its Fifth Amendment jurisdictional claims."

## DISCUSSION

■ Each of the parties has contended that it is entitled to summary judgment in this case. Summary judgment in this court should be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56 of this court is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar in language and effect.[7] Both court rules provide that summary judgment "... shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law." Rule 56(c) of the Rules of the United States Court of Federal Claims provides that in order for a motion for summary judgment to be granted, the moving party bears the burden of showing that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Creppel v. United States*, 41 F.3d 627, 630–31 (Fed.Cir.1994); *Meyers v. Asics Corp.*, 974 F.2d 1304, 1306 (Fed.Cir.1992); *Rust Communications Group v. United States*, 20 Cl.Ct. 392, 394 (1990); *Lima Surgical Assoc., Inc. Voluntary Employees' Beneficiary Ass'n. Plan Trust v. United States*, 20 Cl.Ct. 674, 679 (1990), *aff'd*, 944 F.2d 885 (Fed.Cir.1991). Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment, however, will not be granted if "... the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury [trier of fact] could return a verdict for the non moving party." *Id.; see also Unig Computer Corp. v. United States*, 20 Cl.Ct. 222, 228–29 (1990).

■ When reaching a summary judgment determination, the judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. at 2510–11; *see, e.g., Cloutier v. United States*, 19 Cl.Ct. 326, 328 (1990), *aff'd*, 937 F.2d 622 (Fed.Cir.1991). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or if the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250–52, 106 S.Ct. at 2511–12. When the record could not lead a rational trier of fact to find for the

---

7. In general, the rules of this court are closely patterned on the Federal Rules of Civil Procedure. Therefore, precedent under the Federal Rules of Civil procedure is relevant to interpreting the rules of this court, including Rule 56.

See *Jay v. Sec'y DHHS*, 998 F.2d 979, 982 (Fed. Cir.1993); *Imperial Van Lines Int'l Inc. v. United States*, 821 F.2d 634, 637 (Fed.Cir.1987); *Lichtefeld–Massaro, Inc. v. United States*, 17 Cl.Ct. 67, 70 (1989).

nonmoving party, there is no genuine issue for trial, and the motion must be granted. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). If, however, the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Id.; see also Litton Industrial Products, Inc. v. Solid State Systems Corp.,* 755 F.2d 158, 163 (Fed.Cir. 1985); *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

■■■■ The initial burden on the party moving for summary judgment, to produce evidence showing the absence of a genuine issue of material fact, may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986); *see also Lima Surgical Assoc.,* 20 Cl.Ct. at 679. If the moving party makes such a showing, the burden then shifts to the nonmoving party to demonstrate that a genuine factual dispute exists by presenting evidence establishing the existence of an element of its case upon which it bears the burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. at 2552; *Lima Surgical Assoc.,* 20 Cl.Ct. at 679. If under no scenario can the nonmoving party present the evidence to support its case, then there should be no genuine need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

■■■■ Pursuant to Rule 56, the motion for summary judgment may succeed, whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. at 2553. Generally, however, in order to prevail, the nonmoving party will need to go beyond the pleadings, by use of evidence such as affida-

vits, depositions, answers to interrogatories and admissions, in order to demonstrate that a genuine issue for trial exists. *Id.*

In the instant case, the court finds that there are no genuine issues of material fact in dispute and that this case is appropriate for summary disposition on the cross-motions for summary judgment. In its motion for summary judgment, plaintiff asserts that, pursuant to the Native American allottee leases which Gulf signed, off mine storage charges were to be included with other charges, such as transportation and beneficiation, which were to be deducted in arriving at the value of the ore for royalty purposes. Therefore, the plaintiff urges that it is entitled to a refund because the government should not have assessed the additional royalty fees and interest charges attributable to the reimbursement of storage charges by Florida Power to Gulf.

■■■ Initially, defendant argues that this court lacks subject matter jurisdiction to entertain plaintiff's lawsuit. Alternatively, defendant asserts royalty fees are calculated on the value of production, and that production has been defined as production ready for market. Therefore, according to the defendant, because storage charges are critical to the marketing and sale of the uranium, those charges should be considered part of the cost of production, part of the sale price and should be included in the determination of the royalty fees.

■■■ In order for this court to have jurisdiction, the Tucker Act, 28 U.S.C. § 1491, requires that a substantive right must exist which is enforceable against the United States for money damages, independent of 28 U.S.C. § 1491. The Tucker Act merely confers jurisdiction on the Court of Federal Claims; it does not create any substantive right enforceable against the United States for money damages. *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1351–52, 63 L.Ed.2d 607 (1980) (*Mitchell I*); *United States v. Testan,* 424 U.S. 392, 398–99, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976); *United States v. Connolly,* 716 F.2d 882, 885 (Fed. Cir.1983) (*en banc*), *cert. denied,* 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984).

The Tucker Act permits actions against the United States government founded upon either the Constitution, an Act of Congress, a regulation of an executive department, or upon any express or implied contract with the United States. The Tucker Act provides:

The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1) (Supp. V 1993).

 A waiver of the traditional sovereign immunity "cannot be implied but must be unequivocally expressed." *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 1503, 23 L.Ed.2d 52 (1969). The individual claimants, therefore, must look beyond the jurisdictional statute for a waiver of sovereign immunity. *United States v. Testan,* 424 U.S. at 398, 96 S.Ct. at 953. Stated otherwise, "in order for a claim against the United States founded on statute or regulation to be successful, the provisions relied upon must contain language which could fairly be interpreted as mandating recovery of compensation from the government." *Cummings v. United States,* 17 Cl.Ct. 475, 479 (1989), *aff'd,* 904 F.2d 45 (Fed.Cir.1990); *see also United States v. Mitchell,* 463 U.S. 206, 216–17, 103 S.Ct. 2961, 2967–68, 77 L.Ed.2d 580 (1983) (*Mitchell II* ) (citing *United States v. Testan,* 424 U.S. at 400, 96 S.Ct. at 954, (quoting *Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 607, 372 F.2d 1002, 1009 (1967))); *Duncan v. United States,* 229 Ct.Cl. 120, 138, 667 F.2d 36, 47 (1981), *cert. denied,* 463 U.S. 1228, 103 S.Ct. 3569, 77 L.Ed.2d 1410 (1983).

In support of plaintiff's position that jurisdiction is proper in this court and that a substantive money mandating statute exists, Florida Power states that it "relies on 25 U.S.C. § 2, 9, and 396, 25 C.F.R. §§ 1.2—2.20, § 212, 30 C.F.R. §§ 290.1 *et seq.,* and 43 C.F.R. §§ 3577.2(a) and (b) (in effect during 1983)." Defendant argues, however, that no money mandating statute exists which direct-

ly confers Tucker Act jurisdiction on this court.

The following statements made by plaintiff's counsel during the oral argument, however, are illustrative of the confusing positions urged by plaintiff during these proceedings:

MR. ISRAEL: —and I tell you there is not a statute here. There is when it comes to public lands and there is when it comes to Indian oil and gas, but in the mining area, I could not find a statute. But I find regulations that give us the equivalent right of what the statute gives you where you have got oil and gas and public lands.

THE COURT: Okay. Anything else you need to add?

MR. ISRAEL: And 1491 does not— maybe it ought to, but it does not just require statutes to waive this Court's sovereign immunity. It gives the Executive Department the regulatory authority to do that, assuming the regulations are law.

Furthermore, and equally baffling, are the contradictory comments offered in plaintiff's supplemental brief in support of jurisdiction:

While Florida Power can not [sic] point to an express federal statute permitting it to obtain a refund from an alleged inaccurate royalty determination by the Secretary, we do rely on federal regulations of the Department of the Interior.

Although earlier in this same supplemental brief, plaintiff had stated:

While no court has expressly held that a federal regulatory scheme providing a royalty payor the right to file an administrative appeal before the Secretary of the Interior gives rise to a claim for compensation under 28 U.S.C. § 1491, the courts have so held where federal statutes are involved.

In fact, the statutory provisions offered by plaintiff fail to support plaintiff's claim that Tucker Act jurisdiction is proper in this court. Although the statutory provisions cited by plaintiff deal with mineral leasing on Native American allotted lands, they are general, and in part inapplicable, provisions which cannot be read as money mandating. The language in 25 U.S.C. § 2 defines the

duties of the Commissioner as the Secretary's manager of Native American affairs and relations; 25 U.S.C. § 9 authorizes the President to prescribe necessary regulations for carrying into effect the provisions of any act relating to Native American affairs; and 25 U.S.C. § 396 authorizes leasing on Native American lands.

Likewise, the regulations cited by the plaintiff do not grant Florida Power a right to monetary recovery from the United States, as required by 28 U.S.C. § 1491. Title 25 of the Code of Federal Regulations (C.F.R.), including the sections cited by the plaintiff, contains the regulations governing the relationship with Native Americans; 25 C.F.R. § 1.2 defines the general applicability of the regulations in Chapter I of Title 25 and the availability of forms; 25 C.F.R. §§ 2.1—2.20 establishes the procedures and practices for administrative appeals from agency decisions, but does not pertain to judicial action; Part 212 of 25 C.F.R. addresses leasing of allotted lands for mining, including the mechanics of leasing and operating pursuant to leases, rental and royalty payments. Although § 212.19 applies to the payment of royalties in purchases of oil and § 212.22 discusses lease assignments and overriding royalties on leases, nothing in 25 C.F.R. § 212 grants a damages remedy to a third party purchaser of the minerals. Further, 30 C.F.R. §§ 290.1, et seq., sets forth procedures for administrative appeals within the Department of the Interior, which are inapplicable to the federal courts. Finally, 43 C.F.R. §§ 3577.2(a) and (b) describe the value basis for royalty computation and the requirement for certification of reported royalty values by the lessee. In sum, none of the statutes or rules cited by Florida Power

afford a basis for monetary recovery from the United States by a third party purchaser, such as plaintiff, although a number of the sections cited by plaintiff are directed to the obligations of a lessee, such as Gulf and its legal successor, Chevron.

In large part, the statutes and implementing regulations referred to by plaintiff were designed to define the fiduciary and trust obligations of the United States towards Native Americans, including how to manage the mining leases issued on allotted lands. *See Seminole Nation v. United States,* 316 U.S. 286, 297, 62 S.Ct. 1049, 1054–55, 86 L.Ed. 1480, 1777 (1942); *Navajo Tribe of Indians v. United States,* 9 Cl.Ct. 227, 232 (1985). The legislative history of 25 U.S.C. § 396,[8] first enacted in 1909, supports the view that the intent of Congress was to avoid exploitation of, and prejudice to, the Native Americans as their lands were leased for mining. H.R.Rep. No. 1225, 60th Cong., 1st Sess. at 1–2 (1908); *see also Pawnee v. United States,* 830 F.2d 187, 189 n. 2 (Fed.Cir.1987), *cert. denied,* 486 U.S. 1032, 108 S.Ct. 2014, 100 L.Ed.2d 602 (1988). The statutes and related regulations define the Secretary's authority and responsibility to act in the best interests of the Native Americans, by requiring the proceeds of leases to be given to the Native Americans. *Pawnee v. United States,* 830 F.2d at 189–190. Moreover, consistent with the unique situation of the Native Americans on allotted lands, the courts have acknowledged the right of Native American lessors to seek judicial relief for alleged violations of leases, in their own right, given their ownership rights in the land, despite the retention of supervisory powers over the property by the United States. *Poafpybitty*

**8. LEASES OF ALLOTTED LAND FOR MINING PURPOSES**

All lands allotted to Indians in severalty, except allotments made to members of the Five Civilized Tribes and Osage Indians in Oklahoma, may by said allottee be leased for mining purposes for any term of years as may be deemed advisable by the Secretary of the Interior; and the Secretary of the Interior is authorized to perform any and all acts and make such rules and regulations as may be necessary for the purpose of carrying the provisions of this section into full force and effect: *Provided,* That if the said allottee is deceased and the heirs to or

devisees of any interest in the allotment have not been determined, or, if determined, some or all of them cannot be located, the Secretary of the Interior may offer for sale leases for mining purposes to the highest responsible qualified bidder, at public auction, or on sealed bids, after notice and advertisement, upon such terms and conditions as the Secretary of the Interior may prescribe. The Secretary of the Interior shall have the right to reject all bids whenever in his judgment the interests of the Indians will be served by so doing, and to readvertise such lease for sale.

25 U.S.C. § 396 (emphasis in original).

v. *Skelly Oil,* 390 U.S. 365, 376, 88 S.Ct. 982, 987–88, 19 L.Ed.2d 1238 (1968). This body of case law, however, cannot be relied on to afford plaintiff the jurisdiction it asserts. Plaintiff, Florida Power, is a third party purchaser from Gulf. Plaintiff, Florida Power, does not have a right to sue the United States regarding royalty payments which become due on product produced pursuant to leases to which plaintiff is not a party.

In its supplemental brief, titled "Brief in Support of 28 U.S.C. § 1491 Jurisdiction for Violation of a Federal Regulation," plaintiff also offers a range of cases aimed at trying to demonstrate the propriety of Tucker Act jurisdiction in this court. For example, in its supplemental brief on jurisdiction, plaintiff relies on *United States v. Mitchell,* 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (*Mitchell II* ),[9] to argue that "it [the *Mitchell II* court] created money mandating law from statutes and regulations lacking any reference to monetary relief." Plaintiff appears to find comfort in the following words included in the dissent of *Mitchell II:* "The Court for the most part rests its decision on the implausible proposition that statutes that do not in terms create a right to payment of money nonetheless may support a damage action against the United States." *United States v. Mitchell,* 463 U.S. at 231, 103 S.Ct. at 2975 (*Mitchell II* ). Plaintiff, however, fails to point out that in *Mitchell II* the majority found jurisdiction proper because the government owed a special statutory and regulatory fiduciary responsibility to the plaintiff Native Americans. The *Mitchell II* court stated:

> Because the statutes and regulations at issue in this case clearly establish fiduciary obligations of the Government in the management and operation of Indian lands and resources, they can fairly be interpreted as mandating compensation by the Federal Government for damages sustained. Given the existence of a trust relationship, it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties.

*United States v. Mitchell,* 463 U.S. at 226, 103 S.Ct. at 2972–73 (*Mitchell II* ). Consequently, *Mitchell II* clearly is distinguishable from the facts presented by plaintiff Florida Power. In the case brought by plaintiff, the government owes no fiduciary, or other responsibility to Florida Power, a third party purchaser from the lessee Gulf/Chevron, nor do the statutes or regulations cited by the plaintiff establish such a right.

Plaintiff also cites to *United States v. Testan,* 424 U.S. 392, 401, 96 S.Ct. 948, 954–55, to argue that "the requirement of 'fairly' interpreting federal law as mandating compensation is required only where the claimant does not invoke federal law claiming money improperly exacted or retained." Plaintiff contends that because it invokes federal regulations, specifically those contained in 25 C.F.R. and 30 C.F.R., which require payment to the Secretary, give the Secretary the express right to audit books and finances, give the Secretary the right to recalculate royalty amounts, and give the payor of the royalty a right to seek relief, that these federal statutes or regulations give rise to a claim in this court for a refund of money improperly exacted or retained by federal officials. Plaintiff's argument regarding the *Testan* case also is without merit. Contrary to plaintiff's interpretation, as discussed above, in *United States v. Testan,* the Supreme Court made it clear that a waiver of the traditional sovereign immunity to sue the United States must be "unequivocally" stated and cannot be implied. *United States v. Testan,* 424 U.S. at 399, 96 S.Ct. at 953–54.

Given plaintiff's apparent lack of understanding regarding the rules on jurisdiction based on the Tucker Act, 28 U.S.C. 1491, the court offers the following, albeit lengthy, comprehensive selections from *Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 372 F.2d 1002 (1967) for plaintiff's benefit:

> Section 1491 of Title 28 of the United States Code allows the Court of Claims to entertain claims against the United States 'founded either upon the Constitution, or

---

9. It is interesting to note that plaintiff fails to address the language in *United States v. Mitchell,* 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607 (*Mitchell I* ), discussed earlier in this opinion, which requires a money mandating statute independent of 28 U.S.C. § 1491 to establish jurisdiction in the United States Court of Federal Claims.

any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort'. But it is not every claim involving or invoking the Constitution, a federal statute, or a regulation which is cognizable here. The claim must, of course, be for money. Within that sphere, the non-contractual claims we consider under Section 1491 can be divided into two somewhat overlapping classes—those in which the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum; and those demands in which money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury. In the first group (where money or property has been paid or taken), the claim must assert that the value sued for was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation. In the second group, where no such payment has been made, the allegation must be that the particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum....

We have referred to these cases [the former cases] as those in which 'the Government has the citizen's money in its pocket' and the claim is 'to recover an illegal exaction made by officials of the Government, which exaction is based upon a power supposedly conferred by a statute' [citations omitted]; and we have held that 'suit can be brought in this court to recover [such] exactions said to have been illegally imposed by federal officials (except where Congress has expressly placed jurisdiction elsewhere)' [citations omitted].

The second category includes the varied litigations in which we are urged to hold that some specific provision of law embodies a command to the United States to pay the plaintiff some money, upon proof of conditions which he is said to meet....

Monetary claims which cannot be brought within these limits are beyond this court's jurisdiction, even though they may intimately involve the Constitution, an Act of Congress, or an executive regulation. This is the reverse of saying that this court is not concerned with any and all pecuniary claims against the Federal Government, simply because they rely upon (and in that sense are 'founded upon') an aspect of federal, constitutional, statutory or regulatory law. Where the claimant is not suing for money improperly exacted or retained (the first class defined above), the historical boundaries of our competence have excluded those instances in which the basis of the federal claim—be it the Constitution, a statute, or a regulation—cannot be held to command, in itself and as correctly interpreted, the payment of money to the claimant, but in which some other principle of damages has to be invoked for recovery.... Under Section 1491 what one must always ask is whether the constitutional clause or the legislation which the claimant cites can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained. If not, this court cannot give relief under Section 1491, although some separate general principle—arising, for example, from tort law—might lead to a remedy in another forum or under some special relief provision.

*Eastport Steamship Corp. v. United States,* 178 Ct.Cl. at 605–07, 372 F.2d at 1007–08 (citations omitted).

The court acknowledges that this court previously has accepted jurisdiction to entertain allegations of royalty overpayments, pursuant to subsection 304(c) of the Federal Land Policy and Management Act of 1976, codified at 43 U.S.C. § 1734(c).[10] Furthermore, the court also has entertained claims for royalty overpayment styled as breach of

10. **REFUNDS**
In any case where it shall appear to the satisfaction of the Secretary that any person has made a payment under any statute relating to the sale, lease, use, or other disposition of public lands which is not required or is in excess of the amount required by applicable law and the regulations issued by the Secretary, the Secretary, upon application or otherwise, may cause a refund to be made from applicable funds.
43 U.S.C. § 1734(c) (1988).

contract actions, when a plaintiff is the lessee on the allottee leases. *Marathon Oil Co. v. United States*, 16 Cl.Ct. 332, 335 (1989); *see also Black Butte Coal Co. v. United States*, 27 Fed.Cl. 699, 700 (1993) (vacated as moot upon joint motion at 14 F.3d 612 (Fed.Cir.)); *Foote Mineral Co. v. United States*, 228 Ct. Cl. 230, 232–33, 654 F.2d 81, 84–85 (Ct.Cl. 1981).[11] The cases, however, are distinguishable from the case at bar.

For example, in *Marathon Oil*, the plaintiff owned an undivided fifty percent monetary interest in the leases at issue and sued the United States for breach of those leases, claiming an overpayment of royalty fees to the United States. The court determined that jurisdiction was proper as a 28 U.S.C. § 1491 breach of contract claim. The court stated:

> It is clear this court has subject matter jurisdiction to the extent Marathon seeks a refund of the approximately $1,700,000 paid to MMS [Mineral Management Service] and any additional damages to which it may be entitled arising out of an asserted breach of contract.

*Marathon Oil Co. v. United States*, 16 Cl.Ct. at 335.

■ In the instant case, however, this court does not have jurisdiction over plaintiff Florida Power's third party claim through a breach of contract theory. It is well established that in order for this court to have jurisdiction to entertain a breach of contract claim, the party seeking relief in this court must be in privity with the United States. *United States v. Johnson Controls*, 713 F.2d 1541, 1550 (Fed.Cir.1983); *Plymouth Manufacturing Company, Inc. v. United States*, 114 Ct.Cl. 616, 636, 86 F.Supp. 134 (1949). Florida Power cannot demonstrate a factual basis to establish privity with the United States. Gulf was the lessee named on the allottee leases, signed on May 14, 1968 and May 21, 1968. Although plaintiff Florida Power subsequently signed a purchase

agreement with Gulf for the purchase of the uranium produced pursuant to those leases, plaintiff never entered into any contractual relationship with the United States or with the Native American tribe or its members.

The *Marathon* court also found jurisdiction in the case before it pursuant to 43 U.S.C. § 1734(c). *Marathon Oil Co. v. United States*, 16 Cl.Ct. at 335. Similarly, in *Black Butte Coal Co. v. United States*, 27 Fed.Cl. 699, jurisdiction under 43 U.S.C. 1734(c) was found to be proper.[12] In that case, Rosebud Coal Sales Company was the original lessee, but legally had assigned its lease rights to plaintiff Black Butte Coal Company, the plaintiff suing for a royalty refund. *Id.* at 701. And, in *Foote Mineral Co. v. United States*, 228 Ct.Cl. 230, 654 F.2d 81, in which the court was found to have jurisdiction under 43 U.S.C. § 1734(c) for the plaintiff's claim that there was an overpayment of royalty under its sodium and potassium leases with the government, the plaintiff claiming the refund was the party with which the government had contracted. *Id.* at 232, 654 F.2d at 83–4.

Florida Power, however, also cannot establish a valid claim pursuant to 43 U.S.C. § 1734(c). Under 43 U.S.C. § 1734(c), the person or entity claiming jurisdiction under the statute must have made "a payment under any statute relating to the sale, lease, use, or other disposition of public lands...." In the case at bar, Florida Power did not make any payments directly to the United States. Although in its complaint, plaintiff states "Both the disputed royalty and interest were thereafter paid under protest by Florida Power," it appears from the record that the lessee, not plaintiff Florida Power, actually made the royalty payments to the United States on the leases at issue. The facts emerge most clearly in the affidavit of Gary L. Staley, dated March 9, 1989, attached by plaintiff Florida Power to its proposed findings of uncontroverted fact. In

---

11. The court notes that neither party in this lawsuit raises 43 U.S.C. § 1734(c) as a jurisdictional basis. The court also is aware of plaintiff's statement in its reply brief that although the defendant has argued as if Florida Power has asserted contract claims it has not done so. The court believes, however, that for the sake of completeness, both possible jurisdictional foundations should be addressed briefly.

12. Although this case was later vacated as moot upon joint motion, it is illustrative as to the issue of jurisdiction pursuant to 43 U.S.C. 1734(c).

that affidavit, Mr. Staley identifies himself as an employee of Gulf, who during 1977 to 1983 was involved in, and familiar with, the administration of the Mariano Lake uranium leases at issue, and who was familiar with the purchase agreement between Gulf and Florida Power, including the circumstances surrounding the disputed royalty and interest charges. According to Mr. Staley: "As a result of the additional royalty claims of the United States, Florida Power Corporation through Gulf Mineral Resources paid the United States on October 11, 1985, $697,352 in additional royalty and on December 17, 1985, $133,948 in interest payments." Moreover, in a letter from the MMS to Chevron, dated January 1, 1986, the Department of the Interior acknowledged receipt to Chevron, not to plaintiff, of payment of "your royalty payment totaling $834,049.72." In the January 1, 1986 letter to Chevron, the MMS also instructed Chevron, not plaintiff, to pay the interest due of $171,396.39, and advised Chevron of its right to appeal. Florida Power is not mentioned in the Department's correspondence. The Native American allottee leases signed by Gulf give no indication that a third party was to be responsible to pay the royalty fees owed to the government, and apparently plaintiff made all its payments to Gulf/Chevron, pursuant to the purchase agreement between Florida Power and Gulf, to which the United States was not a party.

Paragraph 5.5 of the purchase agreement between Florida Power and Gulf provides:

5.5 *Contested Payments*

With respect to any cost increase for milling, royalty or items specified in Article 5.2.10 which Purchaser is obligated either to pay directly or reimburse Seller for payment thereof, Purchaser shall have the right to direct whether such cost increases should be paid or contested, and Purchaser shall control any such contest. Purchaser shall pay all expenses which result from such directions, including but not limited to all expenses of any such contest, and any penalty and interest which result from such delayed payment or such contest.

Although this section of the purchase agreement between Florida Power and Gulf, to which neither the United States nor the Native Americans were a party, defines an active role for Florida Power in any royalty increase dispute, this section of the purchase agreement cannot create a waiver of sovereign immunity and a right for Florida Power to sue the United States.

By way of analogy, plaintiff's position is similar to that of a subcontractor attempting to sue the United States for breach of contract. In *Putnam Mills Corp. v. United States,* 202 Ct.Cl. 1, 479 F.2d 1334 (1973), the Court of Claims stated:

It is clear that, unless the plaintiff can provide evidence of the existence of some type of contract between it and the United States, it cannot, as a subcontractor, recover directly from the United States for amounts owed to it by the prime. *United States v. Munsey Trust Co.,* 332 U.S. 234, 241, 67 S.Ct. 1599 [1602], 91 L.Ed. 2022 (1947); *United States Fid. & Guar. Co. v. United States,* 201 Ct.Cl. 1475 [sic] [475] F.2d 1377 (1973).

*Putnam Mills Corp. v. United States,* 202 Ct.Cl. at 8, 479 F.2d at 1337; *see also United States v. Blair,* 321 U.S. 730, 737, 64 S.Ct. 820, 823–24, 88 L.Ed. 1039 (1944); *Merritt v. United States,* 267 U.S. 338, 340–41, 45 S.Ct. 278, 279, 69 L.Ed. 643 (1925); *Severin v. United States,* 99 Ct.Cl. 435, 442 (1943), *cert. denied,* 322 U.S. 733, 64 S.Ct. 1045, 88 L.Ed. 1567 (1944); *Nickel v. Pollia,* 179 F.2d 160, 163–64 (10th Cir.1950). Although the Court of Appeals for the Federal Circuit has recognized certain exceptions to the doctrine that a subcontractor is not in privity with the United States, none of those exceptions are analytically useful in the instant case. *See United States v. Johnson Controls,* 713 F.2d at 1550–52.

In the case at bar, plaintiff Florida Power has no contractual, or other legal relationship with the United States, or with the Native American tribe or its members. Recognizing the importance of the privity relationship between the government and a party attempting to sue the United States, and given the absence of privity between this plaintiff and this defendant, the court will not expand the doctrine of sovereign immunity to extend its jurisdiction to include plaintiff's claims presented in the case at bar.

*CONCLUSION*

Based on the discussions above, it is clear that none of the statutes, regulations or case law upon which Florida Power relies establishes a right for this third party plaintiff to sue the United States for the refund claimed. Plaintiff was not a party to the original allottee leases. Chevron paid the royalties and interest to the government. At the agency level, either Gulf, or its legal successor, Chevron, was the initiator of the agency appeals. In the federal District Court, Chevron initially filed the lawsuit. Although Florida Power was substituted in Chevron's place, the District Court never addressed the issue of whether plaintiff was the proper party to pursue the action, prior to dismissing the action and transferring the case to this court. As the third party purchaser of product, produced pursuant to the Native American allottee leases entered into by Gulf, Florida Power lacks privity with the United States. Therefore, plaintiff is not entitled to bring the instant lawsuit against the United States in the United States Court of Federal Claims. The court, therefore, **DENIES** plaintiff's motion for summary judgment and, hereby, **GRANTS** Defendant's motion for summary judgment. Plaintiff's complaint is, hereby, **DISMISSED.**

**IT IS SO ORDERED.**